# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00709-CV

**Kirk Brand Coburn, Appellant**

**v.**

**Janet Moreland, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-FM-10-005441, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## O P I N I O N

This is an appeal from a modification order in a "high-conflict" suit affecting the parent-child relationship (SAPCR).[1] The appellant, Kirk Brand Coburn, challenges the trial court's modification order, which (1) increased his monthly child-support obligation, (2) granted the appellee, Janet Moreland, the exclusive right to make certain decisions concerning their children's education and health care, (3) restricted his possession of and access to the children while he engaged in limited court-ordered counseling, and (4) awarded Moreland a substantial portion of her attorney's fees and costs. We will vacate the trial court's order in part, dismiss that part of the cause as moot, and affirm the remainder of the trial court's modification order.

---

[1] A "high conflict case" is defined as "a suit affecting the parent-child relationship in which the court finds that the parties have demonstrated an unusual degree of: (A) repetitiously resorting to the adjudicative process; (B) anger and distrust; and (C) difficulty in communicating about and cooperating in the care of their children." Tex. Fam. Code § 153.601(2).

**FACTUAL AND PROCEDURAL BACKGROUND**

On February 11, 2011, Coburn and Moreland ended their twelve-year marriage with an agreed divorce decree. In the decree, Coburn and Moreland were appointed joint managing conservators of their young daughters, E.C. and P.C. Moreland was awarded the exclusive right to designate the children's primary residence, and Coburn was awarded standard possession. Although both parents were reportedly living in Austin when the decree was executed, the standard possession terms included modified possessory rights if the parents began living more than 100 miles apart (long-distance standard possession).

At the time the agreed divorce decree was executed, Coburn had not been regularly employed for several years, and the terms of the decree recognized Coburn's limited financial resources by awarding Moreland a larger share of the marital debts and by limiting Coburn's child-support obligation to $600 per month. The decree, however, contemplated that Coburn would be seeking employment and specified that the $600 child-support obligation would exist only "[f]or the period of time while KIRK BRAND COBURN is unemployed" and would be recalculated "as soon as [he] gains employment."[2]

A mere week after the divorce was finalized, there began a series of events and circumstances that triggered a cascade of escalating discord between the parties that culminated in the underlying modification proceeding and the trial-court order at issue in this appeal. The precipitating event occurred when Coburn picked his daughters up for his first post-divorce weekend

---

[2] The decree states: "[A]s soon as KIRK BRAND COBURN gains employment, his monthly child support obligation will be recalculated pursuant to the guidelines as set forth in the Texas Family Code. The new amount of child support shall start on the 1st day of the month following his starting date of employment."

visitation. Coburn arrived at Moreland's home driving an expensive new vehicle of unknown origin, which caught Moreland's attention. Coburn then took the children to Houston for the weekend after representing to Moreland and his daughters that they would be staying in Austin for the visitation period. As Moreland and the girls would soon discover, Coburn had moved to Houston but had failed to disclose that fact until he was en route to his new home with the girls.

When the girls discovered they were leaving Austin, they telephoned their mother. According to Moreland, she and the girls were frightened by the undisclosed diversion and unsettled by the discovery that Coburn had moved to Houston without their knowledge. Adding to their distress, the children learned during the trip to Houston that their father had begun dating his childhood sweetheart, Holly.[3] When the children returned to Austin, E.C. informed Moreland of that fact and inquired whether Coburn had been dating his new girlfriend before the divorce. Moreland responded that she was not able to answer that question, and she admittedly was upset and angry about the situation.

Moreland was also keenly interested in what appeared to be a sudden improvement in Coburn's financial resources. She was particularly upset by the fact that Coburn was driving a very expensive new car when a mere week before she had taken responsibility for the majority of the marital debt and agreed to accept a $600 monthly child-support payment. Moreland therefore set out to determine whether Coburn had additional financial resources to contribute to the support of his children.

---

[3] Because Coburn and Holly now share the same surname, we refer to her by her first name to avoid confusion.

Although Moreland knew that Holly was extremely wealthy and could have been supporting Coburn financially, he had previously informed her that he was interviewing for a job in Houston. Moreland and her attorney, therefore, repeatedly requested that Coburn disclose the source of his newfound prosperity. Coburn refused the request, but in an e-mail exchange with Moreland's attorney, he denied being employed and closed by saying "[i]t's nice being kept," implying that Holly was his benefactor.

Shortly thereafter, Moreland's attorney noticed Coburn's deposition in an effort to discover information about his financial resources. At that time, Moreland had purchased airline tickets to take her daughters to Costa Rica for spring break, because the standard possession terms of the divorce decree granted her possession of the children at that time. In response to the deposition notice, however, Coburn notified Moreland of his intent to exercise his long-distance standard-possession rights since he was now residing more than 100 miles from the children; in accordance with those provisions, Coburn was entitled to possession of the girls during spring break every year. When Moreland agreed to cancel Coburn's deposition, the girls were permitted to go on the Costa Rica trip as planned. After returning from the trip, Moreland filed the underlying modification petition, seeking recalculation of child support pursuant to the terms of the agreed divorce decree.

In the two months that followed, Coburn and Holly became engaged, and Coburn submitted to a deposition. At his deposition, Coburn testified that he did not have a job, but he was working on starting a venture-capital business. As a result, he had not done anything to apply for a job that would pay a salary and presently had no income. He further disclosed that Holly was supporting him by paying (1) the debt he had assumed in the agreed divorce decree, (2) all of his

4

child-support payments to Moreland, (3) his attorney's fees for the modification proceeding, and (4) all of his monthly credit-card expenses. He explained that Holly had also paid the rent for his furnished two-bedroom apartment and purchased the expensive new car he had been driving. Coburn acknowledged that Holly's financial gifts predated execution of the agreed divorce decree by approximately two months. He further testified that he did not believe $600 per month in child support was "fair" and stated that he believed that an adequate and fair amount of child support for his children was $300 per month.

Coburn was also questioned about his relationship with his daughters. He acknowledged having a poor relationship with them at the time of the deposition, but he blamed Moreland for alienating them from him. Coburn did not accept responsibility for any of the friction and asserted that the only thing he had done to contribute to the situation was that he had married Moreland in the first place.

Coburn's relationship with his daughters further soured after he and Holly were married in July 2011. At that time, Coburn and Holly were anxious to blend their two families, which included Holly's three children from a previous marriage. To that end, Coburn attempted to exercise his long-distance standard-possession rights in Houston, but the girls, who where increasingly exhibiting signs of emotional distress and anxiety, resisted visitation by crying, getting physically ill, refusing to get out of the car, and running away and hiding. The issues the children were experiencing included distress over being so quickly integrated into a new family situation and discomfort at missing events and activities in Austin that were important to them during their father's periods of visitation. The relationship between Coburn and Moreland had also become

highly conflicted, and the parties dispute whether and to what extent the conflict resulted from or caused the situation between Coburn and their daughters.

Due to frequent disagreements about the nature, extent, and location of Coburn's visitation with the girls, a number of efforts ensued to ameliorate the discord and address the transition issues the children were experiencing. Temporary orders were issued concerning Coburn's summer visitation, and a parenting facilitator was appointed to assist in visitation transitions, dispute resolution, and communications between Moreland and Coburn.

The parties also engaged the assistance of therapeutic professionals to address the issues of familial conflict. Dr. Allison Wilcox became the girls' individual therapist. Family counseling was also secured, first from Dr. Susan McMillan and then from Dr. Carlos Loredo.[4] In addition to engaging the services of these therapists, Moreland started attending a divorce support group and participating in individual therapy. Coburn did not retain an individual therapist but did begin attending family therapy sessions.

In therapy, the family worked to address a number of consistent behavior patterns that were identified as having aggravated tensions, including that (1) Coburn minimized or failed to appreciate how his daughters were impacted by the significant and sudden changes in their lives, creating the impression that he was disinterested in their feelings; (2) Coburn disregarded or

---

[4] In an agreed order, the trial court appointed Dr. Loredo to (1) provide family therapy for the parents and the children, (2) make recommendations to the parents as to the parents' interactions with the children, (3) assist the children and their parents in reducing conflict and in facilitating the relationship and visitation between Coburn and the children, and (4) make recommendations concerning visitation, access, and communication between Coburn and the children.

underestimated the girls' need to spend "alone time" with him during visitation;[5] (3) Coburn resisted

the therapists' recommendations to gradually transition the children into their new, blended family;[6]

(4) the children perceived Coburn as being insensitive to their desire to participate in activities and

events they had been participating in for several years before their parents divorced, including events

that were important to them that they would miss if visitation occurred every other weekend in

Houston;[7] (5) Moreland had emotional and angry outbursts towards Coburn and Holly in front of the

---

[5] The girls told their therapist, Dr. Wilcox, that they "wanted to spend time alone with their father" but that "when they went to Houston with their dad they very rarely spent much time alone with him."

[6] Dr. Wilcox and the family therapist, Dr. Loredo, both testified they informed Coburn that it would be therapeutically beneficial for him to spend alone time with the girls and gradually transition them into a blended family. Coburn and Holly, however, did not agree with the therapists' recommendations and instead believed that the best course of action was to force the girls to go on visits with their father and spend time as a blended family. Dr. Wilcox and Dr. Loredo testified that Coburn resisted their recommendations to employ a "step-wise" progression that included time spent alone with the girls. They gave as an example a circumstance in October 2011 when Coburn made plans to spend the weekend with his daughters at a hotel in Austin. Coburn admitted to knowing that the girls believed that they would be spending time alone with their father. Coburn, however, said he never actually "agreed" to spend the weekend alone with the girls so he did not turn Holly and her children away when they "surprised" him and the girls by showing up at the hotel. Dr. Wilcox reported to the court that, after the incident, the girls were "visibly distraught and upset at what they perceive[d] to be their father's deliberate deception." At the time of trial, Coburn and Holly continued to maintain that the therapists' recommendations were wrong.

[7] The girls' activities included swim team, dance, and gymnastics. Issues arose when the girls would have a competition or recital that conflicted with Coburn's visitation periods. Although Coburn complained that Moreland signed the children up for these activities without his consent, the record shows that the girls had been engaged in these activities for years, and although the dates of events changed from year to year, those events were scheduled by third parties, not Moreland. Coburn testified that he tried to be flexible with visitation times to accommodate some of the activities, and the record reflects that the girls were ultimately able to attend most of their activities as a result. The primary source of tension appears to have been Coburn's inability or unwillingness to decide in advance whether the girls would be able to attend scheduled events and activities. This resulted in the girls' feeling anxious and emotional about whether they would actually be able to attend. Coburn asserted that he did not have enough notice of the girls' events to make informed decisions about how the rest of the family would be burdened by accommodating an individual's

7

children on occasion, and the children felt very protective of her;[8] (6) Coburn had said insensitive and hurtful things about Moreland to the children on occasion;[9] (7) Coburn had not followed through with promises to the girls or denied having made promises to them, which caused them to distrust him;[10] and (8) Coburn felt that Moreland encouraged the children to be disrespectful to him and to

activities. Moreland stated that event schedules for at least some activities were available on calendars accessible to Coburn via the Internet.

[8] Moreland admits to having become overly emotional and angry in front of the children on several occasions before she started participating in individual therapy and her divorce support group. Among other things, she admitted to (1) crying and telling the girls that their father was leaving all of them when he asked her for a divorce, which allegedly prompted E.C. to yell "Daddy, I hate you, I hate you"; (2) putting the L sign to her forehead with her fingers to insinuate that Coburn was a "loser" during a temporary-orders hearing; (3) throwing bills into Coburn's car, telling Holly "here, pay these bills, these are for you," saying "F-U, Kirk. Go to hell," and referring to Coburn and Holly as "losers" at one visitation exchange during which both parties called the police; (4) telling Coburn that he had "some balls" for showing up at the girls' swim competition and referring to him as "Mr. Toussaint" (Holly's former surname); (5) stating that Holly did not love E.C. and barely knew her when Holly professed to love E.C. at a gymnastics event; and (6) not telling Coburn or school officials that the girls planned to hide from him when he was coming to pick them up at school for visitation, which created a serious issue at the school. Moreland also admitted to making a number of derogatory comments to Coburn and Holly that were not in the children's presence, but which caused Coburn to believe that similar statements were being made about them to the children. Further, although neither admitted nor denied by Moreland, Coburn and Holly reported that Moreland (1) had to be physically restrained in front of the children on two occasions, (2) had referred to Holly as being "as psychotic as [Coburn]" in front of E.C., (3) had referred to them as "a joke" during the incident at school, (4) had "body checked" Holly at a gymnastics event, and (5) had hit Coburn on "quite a few occasions." It appears to be undisputed, however, that neither these nor similar incidents had occurred in the six months preceding the modification trial. It is likewise undisputed that Coburn never responded in kind.

[9] Coburn admitted that he told the children that Holly was his soul-mate, it was a mistake to have married Moreland, God approved of the divorce because he and Moreland did not have a covenant before God, and God approved of his marriage to Holly because they do have a covenant. Coburn testified that, to some extent, it was important for the children to know this information and that it would help foster a better relationship between him and his children.

[10] In addition to the incident at the hotel, another example of Coburn's allegedly reneging on a deal the girls believed he had made occurred in November 2011. During a meeting, Dr. Wilcox and the girls understood that Coburn was offering to trade weekends so that the girls could spend

resist their visitations with him.[11] Moreland admittedly did not respond well when she was upset, especially in situations she believed were causing her children distress, but she sought therapy to address that behavior and took responsibility for her actions.

Although Coburn denied contributing to his children's distress, he nevertheless agreed to a court order that required the parties "to cooperate with Dr. Loredo and to follow Dr. Loredo's recommendations concerning the children, as to visitation, access, content, and the behavior of the parent toward the child." As a result of this agreement, Coburn had limited visitation with the girls for about six months before trial and mostly interacted with the girls in thrice-weekly Skype sessions and periodic therapy sessions. During this time period, Coburn also voluntarily agreed to increase

Thanksgiving with family members in Austin. Dr. Wilcox said the girls were excited about the opportunity when they left the session. The following day, however, Dr. Wilcox said Coburn exchanged a series of emails with her in which he "completely disavowed everything that happened in the session the previous day," including his agreement to trade weekends. According to Dr. Wilcox, Coburn "consistently placed the girls in a position in which they begin to second-guess their own thoughts. When they are unable to rationalize what their father has done[,] they begin to become angry and disillusioned with [him]."

[11] Coburn complained that Moreland did not consistently reprimand the children for speaking disrespectfully or inappropriately to or about him, but it was disputed whether and to what extent the children were being "disrespectful" versus appropriately expressing their feelings. The therapists who testified at trial said that the children needed to be able to express their feelings to their father and that it was debatable as to where some of the interactions fell on the spectrum between communication of feelings and disrespect. Coburn further testified that, on occasion, the children criticized him using language he believes they had heard from their mother.

Coburn asserted that Moreland had interfered with his relationship with the girls from the outset of their separation. He testified that he was asked not to take possession of the girls for a while because Moreland and his daughters were having difficulty with the divorce. Then, when he did begin taking possession, he said that Moreland complained that the girls were scared to visit him at his new home in Austin and that she consistently interrupted his periods of possession because she would pick up the girls on their request. There is also evidence that Moreland suggested to the girls that they would not have to go on visits with their father if they were unwilling or if he was more than 15 minutes late to pick them up. The parties further dispute the extent of Moreland's role in the children's plan to hide at school to avoid a scheduled visitation with their father. Finally, Moreland admitted to having expressed to Coburn that she wanted him out of the girls' lives permanently.

9

his child-support payment to the statutory guideline maximum of $1,875 per month while the modification suit was pending. *See* Tex. Fam. Code § 154.125 (guidelines for determining presumptive child-support obligation).

Moreland and Coburn also agreed to submit to psychological evaluations, and the trial court appointed Dr. Alissa Sherry to perform those evaluations.[12] After completing the evaluations, Dr. Sherry diagnosed Coburn with "narcissistic personality disorder" with "sociopathic traits." Dr. Sherry found that Coburn "places his own needs over the needs of the children" and is "willing to forgo the girls' events in favor of his own needs and has [also] exercised serious lapses in judgment in his communication[s] with other mental health professionals trying to assist the family." Dr. Sherry concluded that Coburn "is not likely to take responsibility for his actions and instead tends to blame and project his shortcomings on to [sic] others." As a result, she determined that "the likelihood of [Coburn's] ability to engage in effective co-parenting is seriously limited as is his ability to place the needs of others ahead of himself." She further found that Coburn had engaged in "gaslighting behavior," which she defined as "manipulative behavior used to confuse people into questioning their reactions to events, so much so that the victims of gaslighting begin to question their own sanity." She observed that gaslighting is often referred to as "'crazy-making' as it makes otherwise ordinary functioning individuals act 'crazy' in the face of such discrepant pieces of information."

In comparison, Dr. Sherry determined that Moreland did not meet the criteria for any personality disorder. She also concluded that Moreland's actions did not meet the threshold for

---

[12] As with the other therapeutic professionals, Dr. Sherry was recommended by either Coburn or his attorneys.

10

parental alienating behaviors. She further opined that "when [Moreland's] behavior has become unrestrained, it is the result of behaviors that are insensitive, narcissistic, or baiting on the part of Mr. Coburn." Also, in contrast to Coburn, Dr. Sherry found that Moreland was "interpersonally inclined towards cooperative, mutually satisfying relationships." Dr. Sherry concluded that Moreland's "healthy reality testing, likelihood of engaging in cooperative relationships, and affective stability bode well for both healthy parenting and the ability to co-parent with others. However, because of Mr. Coburn's existing psychopathology, the likelihood of this parent dyad to co-parent with each other is tentative at best."

In April 2012, about two months before trial, Moreland expanded her modification petition to include a request to be granted exclusive rights and duties with respect to several aspects of the children's lives. Moreland also sought significant modifications to Coburn's possessory rights and requested that the trial court order Coburn to (1) exercise all of his periods of possession in Travis County; (2) take the children to all of their extracurricular activities and events during his periods of possession; (3) engage in individual counseling in order to have possession of and access to the children; (4) submit to supervised visitation, as recommended by the children's therapists; (5) pay for the children's therapy; and (6) Skype with the children only if recommended by the children's therapists.

In response, Coburn filed a counter-petition requesting appointment as the children's sole managing conservator or, in the alternative, joint managing conservator with the exclusive right to make certain decisions regarding the children, including the right to designate their primary residence. According to Coburn and Holly, Moreland's interference was the driving factor in the

11

problems the girls were experiencing with their father. As a result, Coburn sought sole custody as a means of forming a positive relationship with his children and successfully blending his families. At that time, however, Coburn had not had weekend possession of the girls in several months because he had not complied with Dr. Loredo's therapeutic recommendations and because his estrangement from his daughters was intensifying.[13] Dr. Sherry observed that Coburn's request for immediate sole custody, given the status of his relationship with the children—and contrary to the therapists' recommendations—was consistent with a diagnosis of narcissistic personality disorder, but she acknowledged that it could also have reflected the advice of legal counsel.

At trial, Dr. Wilcox and Dr. Loredo testified that even with professional intervention and regular Skype communications, the girls' emotional state and estrangement from their father had gotten worse. According to the therapists, significant reasons for the lack of improvement included (1) Coburn's unwillingness to follow their therapeutic recommendations, including spending alone time with the girls and employing a "step-wise" progression of visitation with the blended family in Houston; (2) his professed inability to regularly attend therapy sessions with Dr. Loredo due to his work schedule during the week; and (3) his disturbing interactions with the children in recorded Skype sessions, in which he appeared indifferent and unsympathetic to their emotional distress and flaunted the lavish lifestyle he was living. Both Dr. Wilcox and Dr. Loredo also testified that they had observed interpersonal conduct by Coburn that was consistent with Dr. Sherry's diagnosis of

---

[13] The court order appointing Dr. Loredo provided a method of recourse if a party objected to the doctor's recommendations or did not wish to follow those recommendations. Under the court's order, an objecting party was required to give written notice to Dr. Loredo and the other parties of "the intention not to abide by Dr. Loredo's recommendations" and had the duty to bring the matter to the trial court's attention. There is no indication in the record that Coburn followed this procedure.

narcissistic personality disorder with sociopathic traits. Dr. Loredo further declared that there were video recordings of instances in which Coburn had engaged in "gaslighting behavior" with the children, which he characterized as "a type of psychological abuse." Dr. Wilcox opined that both girls were suffering from "systemic emotional abuse" and that Coburn was the parent primarily responsible for the emotional abuse they had endured. She observed that, although the girls were angry at both their mother and father, they had enjoyed alone time with their mother to work through their feelings, but their father would not spend alone time with them, even at the therapists' behest.

Dr. Wilcox also agreed with Dr. Sherry's conclusion that Moreland had not alienated the girls from their father and, instead, had helped facilitate the girls' spending time with him. Dr. Loredo further testified that Moreland had been helpful in getting the girls to participate in therapy sessions with their father when they were resisting. Both therapists acknowledged, however, that Moreland had behaved inappropriately in front of the children in ways that were neither proper nor helpful, and Dr. Wilcox testified that Moreland's "screaming at [Coburn] in front of the school [during one visitation exchange] is probably emotionally abusive." They noted, however, that Moreland had accepted responsibility for her behavior, undertaken measures to rectify it, and had not—to their knowledge—engaged in similar conduct in the six-month period preceding trial.

Both Dr. Wilcox and Dr. Loredo opined that it would be inadvisable to force the girls to go on visits with their father given the state of their relationship at that time. They explained that forced visitation would probably make the situation worse and would be detrimental to the girls. Both therapists also recommended to the court that the children not be required to visit with their father unless a third party, preferably a therapist, was present as they employed a step-wise transition

13

into long-distance standard possession with Coburn and the blended family. Dr. Loredo also testified that Coburn needed individual counseling with a therapist who would communicate with the other therapists and not just rely on Coburn's version of events. According to Dr. Loredo, a family dynamic that includes a diagnosis of narcissistic personality disorder is among the most difficult to work with and has the potential to be very destructive in a family system. He stated, however, that he believed therapy would be beneficial because Coburn and the children truly love each other and want a healthy relationship.

Dr. Sherry concurred that therapeutic intervention was necessary to address Coburn's manipulative behavior, which she testified is destructive to a relationship between parent and child. She asserted that it was important for Coburn to understand that he needs to make changes. As a result, she observed that he would need to work with a therapist who would challenge his perspective and not simply mirror his world view. Dr. Sherry further testified that it would be detrimental to force the girls to "hurry up" into a blended family until some time had been spent "acknowledging and repairing the damage that's been done and easing the kids into a relationship with that acknowledgment . . . ." With respect to the children's activities, she stated that there needed to be more proactive management of the children's expectations regarding attendance. Specifically, she said, in order to reduce the children's anxiety, there needed to be a plan for the children to understand in advance what they can attend, who will be attending with them, and what they will have to miss. She opined that an authoritative approach that did not take into consideration the children's desires and feelings would be ineffective and would enhance conflict with the children,

who are at or approaching a developmental stage where their individual identities are becoming important to them.

With regard to shared parenting rights, Dr. Sherry testified that it was possible for Coburn to effectively co-parent if circumstances were structured in a way that benefitted him, but she stated that "he's going to have some problems anytime he gets a response from others, whether it's the girls or Ms. Moreland, that he doesn't want or that doesn't fit his view of himself. But the more it can be structured in a way . . . that he has something to gain by it, probably the better." She further recommended that Moreland and Coburn have no contact with each other and that one parent be granted the exclusive right to make decisions regarding the children to minimize their interactions. She observed that Moreland is the "predominant parent" and that there are a number of psychological issues with Coburn that interfere with his ability to respond appropriately to the children's emotional needs.

At the time of trial, Coburn testified that he had met with an individual therapist for one hour on one occasion, but little was known about the therapist's qualifications. Although Coburn was not committed to the idea that he needed to participate in therapy, he professed a willingness to do so. Ultimately, both Coburn and Holly testified that they did not agree with Dr. Sherry's diagnosis and did not agree with salient aspects of Dr. Wilcox's and Dr. Loredo's therapeutic recommendations. Coburn testified that it would be in the girls' best interests if he were awarded primary possession, or in the alternative, standard possession that was not conditioned on therapeutic participation or the recommendation of any therapists as to the frequency and duration of appropriate visitation. Although Coburn conceded that his decisions to divorce Moreland, move

15

to Houston, and introduce a new family into the girls' lives had been difficult for them, he maintained that Moreland was primarily responsible for the problems between him and the girls and had exacerbated the situation. Meanwhile, Holly testified that Moreland was "95 percent" of the cause of the estrangement between Coburn and his daughters and was the sole impediment to improving the situation. She asserted that the solution to the problem was for Coburn to be more authoritative in enforcing visitation with the girls. Dr. Loredo testified that Holly's opinion reflected a "simplistic solution" to a complicated situation and showed a "lack of insight."

With regard to the child-support issue, Coburn testified that he was presently self-employed as a venture capitalist. He admitted that he considered himself to have a job, but did not currently make any money due to the compensation structure of his business, which he said is standard in the industry. He agreed that "the decision not to take a [paying] job is a voluntary one" on his part and stated that his wife's financial support is helping him do so. He testified that he is "voluntarily . . . not seeking or accepting employment" and would not do so for the foreseeable future because "it's not about the money." He testified that, if he obtained gainful employment, he could reasonably expect to earn between $100,000 and $200,000 per year. Although Moreland's counsel sought to introduce evidence about Holly's financial resources, the trial court concluded that the proffered evidence was irrelevant to the child-support issue before the court. *See* Tex. Fam. Code § 156.404 ("The court may not add any portion of the net resources of a new spouse to the net resources of an obligor or obligee in order to calculate the amount of child support to be ordered in a suit for modification."); *see also id.* § 154.069 ("The court may not add any portion of the net

16

resources of a spouse to the net resources of an obligor or obligee in order to calculate the amount of child support ordered.").

After hearing the foregoing evidence, the trial court observed that all three expert witnesses recommended something other than granting Coburn primary possession or immediate standard possession. Accordingly, the court entered an order denying Coburn's modification request in its entirety and directing Coburn to participate in 25 weeks of individual therapy with his chosen therapist and 25 weeks of family therapy with Dr. Loredo before resuming standard possession. The trial court also required Coburn to execute a release allowing the therapists to share information with one another and with Dr. Wilcox. During the 25-week period, Coburn was entitled to supervised visitation with the girls for 1.5 hours each week and could Skype with the girls in a frequency and manner directed by Dr. Loredo. The trial court further denied Coburn extended possession of the girls for 42 consecutive days in the summer of 2012, as he had requested under his standard possession rights. The trial court's order further awarded Coburn standard possession upon completion of the required counseling. Moreland, however, was awarded the exclusive right to make decisions concerning the children's education and to consent to non-invasive medical and dental procedures and psychiatric and psychological treatment of the children.

With respect to child support, the court found that Coburn had admitted to intentional underemployment and his ability to make a six-figure income. The court determined that Coburn has the ability to make $200,000 per year and that his monthly net resources are $12,736.11. The court also found the children's proven support needs to be $3,557.50 per month.[14] Based on these

---

[14] At trial, Moreland introduced evidence concerning the actual expenses incurred to support the children. The court determined that some of the expenses could be segregated between Moreland

determinations, the court concluded that the statutory guideline child-support payment was $1,875 and that Coburn was responsible for paying 50% of the children's proven needs above the guideline amount, resulting in a child-support obligation of $2,716.25. *See id.* §§ 154.125 (presumptive percentage guidelines applicable to obligor's net resources), .126 (court order for additional child-support amounts based on parents' income and child's proven needs); *see also id.* § 156.402 (effect of child-support guidelines in modification proceeding). The court also awarded Moreland $165,366.65 in attorney's fees, which is approximately 80% of the attorney's fees Coburn stipulated to be reasonable and necessary. *See id.* § 106.002(a) (vesting trial court with discretion to award reasonable attorney's fees in SAPCR proceeding). In addition to the final order modifying the agreed divorce decree, the trial court issued findings of fact and conclusions of law supporting the court's judgment.

In four issues on appeal, Coburn asserts that the trial court abused its discretion in (1) deviating from the standard possession order and conditioning possession and access on his participation in 25 weeks of court-ordered counseling, (2) granting Moreland exclusive decision-making rights concerning the children's education and health care, (3) determining that a change in circumstances warranted modification and increasing his child-support obligation based

---

and the children, while other expenses were not readily divisible between them. As for the non-divisible expenses—mortgage, household, groceries, meals away from home, transportation, and incidentals—the court attributed one-third of some expenses and one-half of other expenses to the children. Expenses attributable solely to the children—including school lunches and life insurance—were fully credited to the children's support needs. The court disregarded expenses that could have been segregated but were not, including medical and mental-health care, clothing, and shoes.

on a finding that he was voluntarily underemployed, and (4) requiring him to pay any of Moreland's attorney's fees and court costs related to the modification proceeding.[15]

**DISCUSSION**

The issues presented in this appeal are subject to review for clear abuse of discretion. *See, e.g.*, *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied); *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied); *Echols v. Olivarez*, 85 S.W.3d 475, 476 (Tex. App.—Austin 2002, no pet.); *Satterfield v. Huff*, 768 S.W.2d 839, 841 (Tex. App.—Austin 1989, writ denied). "A trial court abuses its discretion only when it has acted in an unreasonable or arbitrary manner, or when it acts without reference to any guiding principle." *In re Marriage of Jeffries*, 144 S.W.3d 636, 638 (Tex. App.—Texarkana 2004, no pet.) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). Under this standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error but are relevant factors in determining whether the trial court abused its discretion. *Zeifman*, 212 S.W.3d at 587; *Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.); *In re Davis*, 30 S.W.3d 609, 614 (Tex. App.—Texarkana 2000, no pet.). In determining whether the trial court abused its discretion, we consider whether the trial court had sufficient evidence upon which to exercise its discretion and, if so, whether it erred in the exercise of that discretion. *In re W.C.B.*, 337 S.W.3d 510, 513 (Tex. App.—Dallas 2011, no pet.). We consider only the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence. *Worford*,

---

[15] Coburn does not challenge the trial court's denial of his modification counter-petition.

801 S.W.2d at 109. A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the court's decision. *Valdez v. Valdez*, 930 S.W.2d 725, 731 (Tex. App.—Houston [1st Dist.] 1996, no writ).

We are further mindful that "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.). We, therefore, defer to the trial court's judgment in matters involving factual resolutions and any credibility determinations that may have affected those resolutions.[16] *George v. Jeppeson*, 238 S.W.3d 463, 468 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

### Possession and Access

In his first appellate issue, Coburn challenges the portion of the modification order denying him standard possession and restricting his access to the children contingent on his participation in 25 weeks of individual and family psychological counseling. Coburn asserts that the

---

[16] Although Coburn's briefing focuses on who is to "blame" in this case and which of the parents is being "punished" and "rewarded" for creating or contributing to the underlying family conflict, the trial court's paramount concern is what is in the *children's* best interests based on the evidence before the court. *See* Tex. Fam. Code §§ 153.002 ("The best interest of the child shall *always* be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." (emphasis added)); 156.101 (modification of possession and access must be in child's best interest), .402 (modification of existing child-support order must be in child's best interest); *see also Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (observing that trial court has "wide latitude" in determining child's best interest). As illustrated by the biblical story of wise King Solomon, the desires and best interests of a parent should yield to the welfare and best interests of a child when those interests are in conflict. *Cf. Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ) (in cases involving termination of parental rights, concern is for child's best interest, not parent's best interest).

restriction of his possession and access conflicts both with the rebuttable presumption that standard possession is the "minimum reasonable possession" to which he is entitled and with the trial court's finding that it is in the children's best interests that Coburn remain a joint managing conservator. *See* Tex. Fam. Code §§ 153.131(b) (rebuttable presumption that appointment of parents as joint managing conservator is in child's best interest), .134 (factors to be considered in determining whether joint managing conservator arrangement is in child's best interest), .252 (rebuttable presumption that statutory standard possession order provides "reasonable minimum possession" for possessory or joint managing conservator and is in child's best interest), .256 (factors court may consider in ordering less than standard possession); *see also Blackwell v. Humble*, 241 S.W.3d 707, 720-21 (Tex. App.—Austin 2007, no pet.) (concluding that indefinite denial of possession and severe restriction of visitation conflicted with trial court's implied finding that mother's continued appointment as joint managing conservator was in children's best interests). Coburn also argues that trial courts have no statutory authority to order less than standard possession when the parents are named joint managing conservators. *See* Tex. Fam. Code § 153.256 (providing factors court may consider in awarding other than standard possession, including "the circumstances of the managing conservator and of the parent named as a possessory conservator"). *But see id.* § 153.252 (stating that *rebuttable presumption* regarding standard possession applies to "parent named as a possessory conservator or joint managing conservator"). To the extent the trial court has discretion to grant less than standard possession, Coburn asserts that the restrictions the trial court imposed are not supported by sufficient evidence because the record reflects that both he and Moreland contributed

21

to the systemic emotional problems with their daughters and therefore the trial court's order "punishes" only him.

After this appeal was perfected, we were informed that Coburn completed the required therapy sessions and resumed long-distance standard possession of E.C. and P.C. As a result, Moreland asserts that Coburn's first appellate issue is moot. *See Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) ("[A] controversy must exist between the parties at every stage of the legal proceedings, including the appeal."). In the alternative, Moreland contends the trial court had both the statutory authority and sufficient evidence to limit Coburn's possession and access contingent on his participation in individual and family counseling. *See In re L.M.M.*, No. 03-04-00452-CV, 2005 WL 2094758, at *9 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.) (observing that "[t]rial courts are not obligated to order standard possession; if a court determines that the standard possession order is not in the child's best interest, then the court can either deny possession and access altogether or 'fashion an order that restricts possession or access so as to eliminate any danger to the physical or emotional welfare of the child'" (quoting *In re Walters*, 39 S.W.3d 280, 286 (Tex. App.—Texarkana 2001, no pet.))); *see also In re J.S.P.*, 278 S.W.3d 414, 422 (Tex. App.—San Antonio 2008, no pet.) (no per se prohibition on allowing neutral third party, such as mental-health professional, to incrementally expand possession rights of parent with limited cognitive abilities).

Under our constitution, courts have no jurisdiction to render advisory opinions. *See* Tex. Const. art. II, § 1. As a result, a court cannot decide a case that has become moot during the pendency of an appeal. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012).

22

A case becomes moot if, since the time of filing, there has ceased to exist a justiciable controversy between the parties—that is, if the issues presented are no longer 'live,' or if the parties lack a legally cognizable interest in the outcome. Put simply, a case is moot when the court's action on the merits cannot affect the parties' rights or interests. If a case is or becomes moot, the court must vacate any order or judgment previously issued and dismiss the case for want of jurisdiction.

*Id.* (internal citations omitted).

Although a decision on the possession and access issue on appeal would no longer affect the parties' rights or interests as to that matter, Coburn contends the issue is not moot under the "capable-of-repetition-yet-evading-review" exception to the mootness doctrine. *See General Land Office of State of Tex. v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 571 (Tex. 1990). The Texas Supreme Court has explained that this exception

applies only in rare circumstances. To invoke the exception, a complaining party must prove that: (1) the challenged action was too short in duration to be litigated fully before the action ceased or expired; and (2) a reasonable expectation exists that the same complaining party will be subjected to the same action again.

*Williams*, 52 S.W.3d at 184 (citations omitted).

With respect to the "evading-review" element, the proper inquiry is whether the challenged activity is by its very nature short in duration so that it could not, or probably would not, be able to be adjudicated before becoming moot. *See id.* The plaintiff must show that the time between the challenged action and its expiration is always so short as to evade review. *See Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (petitioner could not show that time between parole revocation and expiration of sentence is always so short as to evade review). When determining the

23

"capable-of-repetition" element, there must be a "reasonable expectation" or a "demonstrated probability" that the same controversy will recur involving the same complaining party. *See Murphy v. Hunt*, 455 U.S. 478, 482 (1982); *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975); *City of Dallas v. Woodfield*, 305 S.W.3d 412, 419 (Tex. App.—Dallas 2010, no pet.); *Dear v. City of Irving*, 902 S.W.2d 731, 736 (Tex. App.—Austin 1995, writ denied).

We conclude that Coburn has not satisfied the requirements for the "capable-of-recognition-yet-evading-review" exception.[17] Even assuming the issue on appeal "is always so short as to evade review," Coburn has not addressed the second prong of the exception at all, and it is not apparent that there is a "reasonable expectation" that he will be subjected to the same action again. "The mere physical or theoretical possibility that the same party may be subjected to the same action again is not sufficient to satisfy the test." *Woodfield*, 305 S.W.3d at 419 (citing *Murphy*, 455 U.S. at 482). The therapists who testified at trial were generally in agreement that it was possible for therapy and a step-wise integration of the children into their new blended family to help remediate the alienation between Coburn and his children and help the children heal emotionally. If these measures were beneficial in rectifying the problems between Coburn and his daughters, it would not be reasonable to expect the trial court to have an occasion to impose similar restrictions in the future. Correspondingly, if therapy was not effective, it would not be reasonable to expect the trial court to continue to pursue a course of action that had proven fruitless. Although it is certainly possible that the same or similar restrictions could be imposed in the future, there is

---

[17] In light of this determination, we need not consider Moreland's alternative argument that the "capable-of-repetition-yet-evading-review" exception does not apply in this case because it only applies to unconstitutional acts performed by the government. *See General Land Office of State of Tex. v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 571 (Tex. 1990).

24

no demonstrated probability of that occurrence. Accordingly, we conclude that Coburn's first appellate issue is moot, and we therefore vacate the portion of the trial court's judgment placing restrictions and conditions on Coburn's rights of possession and access. *See Thompson v. Ricardo*, 269 S.W.3d 100, 103-04 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (when case becomes moot during appeal, appellate court should vacate trial court's judgment).

### *Rights and Duties of the Parents*

The second complaint Coburn advances is that the trial court abused its discretion in awarding Moreland the exclusive right to make decisions regarding E.C.'s and P.C.'s education and to consent to non-invasive medical and dental procedures on their behalf.[18] Coburn contends there is no evidence that he should be denied participation in such significant matters of decision regarding the children. He further contends there is no evidence that he and Moreland were in actual conflict regarding the children's education and non-invasive health-care decisions or that he was apathetic about or neglectful of these matters. Accordingly, he contends there is no evidence to support the trial court's determination that limiting his parental rights is in the children's best interests.

When parents are named joint managing conservators, the trial court must allocate parental rights and duties to be exercised independently, jointly, or exclusively. Tex. Fam. Code § 153.071 (court required to specify rights and duties of parent appointed conservator); .072 (court may limit rights and duties if written finding that limitation is in child's best interest), .134(b)(2), (4) (rights and duties in court-ordered joint conservatorship); *see also id.* § 151.001 (parental rights

---

[18] The trial court also awarded Moreland the exclusive right to consent to psychiatric and psychological treatment of the children, but Coburn does not appear to challenge this portion of the court's judgment.

and duties). Parents can be appointed joint managing conservators even if the exclusive right to make certain decisions is awarded to only one parent. *See id.* § 101.016 (defining "joint managing conservatorship" to mean "the sharing of the rights and duties of a parent by two parties, ordinarily the parents, even if the exclusive right to make certain decisions may be awarded to one party").

In the agreed divorce decree between Coburn and Moreland, the parties were granted the joint right to make educational decisions and to consent to non-invasive medical and dental procedures on behalf of their daughters. The Family Code provides that the court may modify a prior order (1) if doing so would be in the child's best interest and (2) if the child's or parties' circumstances have "materially and substantially changed" since the order was rendered. *Id.* § 156.101(a)(1). The party seeking modification has the burden to establish these elements by a preponderance of the evidence. *See Zeifman*, 212 S.W.3d at 589 (addressing modification of conservatorship).

As to the first element, there is no bright-line rule for determining what is in a child's best interest; each case must be determined on its unique set of facts. *See Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). In this case, it is fairly indisputable that Moreland and Coburn have been unable to co-parent amicably. Indeed, there is overwhelming evidence that they have not been able to communicate with one another without escalating conflict, and as a result, they have largely withdrawn from communicating with each other. While Coburn blames Moreland for the conflict and lack of communication, there is ample evidence that Coburn contributed to or incited the conflict; there is also some evidence that for some period of time and to some extent he voluntarily ceded to Holly his responsibility to communicate with Moreland and the girls' therapists. The record

also contains evidence that Coburn has challenged Moreland's authority under the agreed divorce decree to make regular medical and dental appointments for the girls and to re-enroll them in their extracurricular activities without his consent. The tensions between Coburn and Moreland also resulted in Moreland's failing to effectively communicate with Coburn about an issue with P.C.'s reading ability.

Dr. Sherry testified that one of the parents should be given the exclusive right to make significant decisions regarding the children because Coburn and Moreland cannot effectively co-parent. Although Dr. Sherry did not recommend one parent over the other, she observed that Moreland is the "predominant" parent. The record supports this observation with undisputed evidence that Moreland has always been the primary caretaker for the children and principally responsible for taking them to school, extracurricular activities, and medical appointments. In contrast, Dr. Sherry testified that Coburn has a number of psychological issues that interfere with his ability to respond appropriately to the children's emotional needs. Dr. Sherry's psychological evaluation of Moreland and Coburn was also introduced into evidence. In that report, Dr. Sherry found that Moreland was likely to engage in cooperative relationships, which she said "bode[s] well for both healthy parenting and the ability to co-parent with others." She noted, however, that it was unlikely that Moreland could effectively co-parent with Coburn due to his "existing psychopathology." Of particular note, Dr. Sherry concluded that "the likelihood of [Coburn's] ability to engage in effective co-parenting is seriously limited as is his ability to place the needs of others ahead of himself."

Whatever the cause or blame for the conflict, there is ample evidence that Moreland and Coburn cannot effectively co-parent. The trial court was therefore justified in selecting one parent as exclusive decision-maker to avoid conflict. Rather than taking a kitchen-sink approach, the trial court made a reasoned analysis in determining which decisions should be exercised exclusively by one parent because they are likely to arise more frequently than other matters over which the parties retain joint decision-making authority. At the conclusion of the trial, the court explained that the high-conflict nature of the case warranted the assignment of exclusive decision-making rights for education and health care to provide a measure of stability for these important decisions and to avoid the parties' "coming back to court every time a decision needs to be made." Moreover, there have been actual conflicts and lapses regarding the children's educational needs and participation in extracurricular activities due to the dynamic between Moreland and Coburn. Furthermore, Moreland is and has been the primary parent, and she retains primary possession of the children, which makes the trial court's assignment of those rights to her logical. Finally, there is evidence that Coburn's ability to place his children's needs before his own is impaired. *See Garza v. Garza*, 217 S.W.3d 538, 553-54 (Tex. App.—San Antonio 2006, no pet.) (trial court did not abuse discretion in awarding exclusive health-care and education decision-making rights to father in light of evidence that mother "had difficulty thinking rationally and logically, controlling her mood swings and anger, and arriving at a logical solution when faced with a problem"). The trial court retains broad discretion in crafting the rights and duties of each conservator to promote the children's best interests. *See Swaab v. Swaab*, 282 S.W.3d 519, 532 (Tex. App.—Houston [14th Dist.] 2008, pet. dism'd w.o.j.). On this record and under the highly

28

deferential standard of review applied in modification cases, we cannot conclude that the trial court abused its discretion in granting Moreland the exclusive right to make education and health-care decisions in the children's best interests.[19]

Coburn did not challenge proof of the second modification element, that is, a material and substantial change in circumstances since rendition of the agreed divorce decree. Even if his brief could be construed to include such a challenge, there is ample evidence from which the trial court could have concluded that there was a material and substantial change in the parties' ability to effectively co-parent since rendition of the agreed divorce decree. In addition, Coburn's counter-petition for modification of parental rights—which included the very rights at issue in this appeal—alleged a material and substantial change in circumstances, which constitutes a judicial admission as to this element. *See In re A.E.A.*, 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.).

In sum, Coburn has not shown that the trial court acted in an unreasonable and arbitrary manner or without reference to guiding principles when it found that it was in E.C.'s and P.C.'s best interests for Moreland to be awarded the exclusive right to make educational and non-invasive health-care decisions. We overrule Coburn's second issue.

---

[19] Coburn argues that there must be sufficient evidence of parental conflict, apathy, or neglect with regard to the *specific* parental rights that have been limited. While the parties have cited a number of cases in which such circumstances have existed and were noted, Coburn has cited no authority—nor have we found any—suggesting that the trial court's discretion is so limited.

*Child Support*

In his third appellate issue, Coburn challenges the trial court's award of increased child support.[20] Coburn contends the trial court abused its discretion by (1) modifying his child-support obligation based on a finding that he is voluntarily underemployed; (2) erroneously calculating the "proven needs" of the children; (3) failing to provide specific reasons for imposing child support in excess of the percentage guidelines in section 154.125 of the Family Code; and (4) considering his interim voluntary support payments in modifying his support obligation.

A trial court has the authority to modify a child-support obligation if "the circumstances of the child or a person affected by the order have materially and substantially changed" since the rendition of the prior order of child support. *See* Tex. Fam. Code § 156.401(a)(1). The absence of a material and substantial change is a theme that underlies the core child-support dispute in this case. Because this matter logically precedes the specific allegations of error, we begin our analysis by considering whether modification of the child-support terms in the agreed divorce decree was warranted by sufficient evidence of a material and substantial change in circumstances. The party seeking modification has the burden to establish these elements by a preponderance of the evidence. *See Zeifman*, 212 S.W.3d at 589 (addressing modification of conservatorship).

In contesting the trial court's finding of voluntary underemployment, Coburn asserts that neither his income nor his "earning potential" changed following the divorce. He contends that

---

[20] Coburn's briefing lacks clarity regarding exactly what he contends his child-support obligation should be, but his position on that matter is ultimately immaterial in light of our disposition of this appellate issue.

30

the only material changes of circumstance were that he became romantically involved with a wealthy woman whose generosity and support have enabled him to pursue a business venture that currently pays him no income but has the potential for being very lucrative. As Coburn points out, the resources of a new spouse are not relevant to determining the net resources of a child-support obligor, *see* Tex. Fam. Code § 156.404, and the trial court correctly refused to consider such evidence. Independent of Holly's financial resources, however, there is sufficient evidence from which the trial court could have properly concluded that Coburn's circumstances changed in that he was not *voluntarily* unemployed or underemployed when the divorce decree was executed but became so when he began pursuing his new venture-capital business.

In the agreed divorce decree, the parties acknowledged that Coburn was unemployed, and his child-support obligation was set taking that circumstance into consideration. However, the decree also reflects—with bolding and underlining for emphasis—that the parties anticipated that Coburn would be seeking employment more commensurate with his earning potential and expressly contemplated recalculation of his child-support obligation on the happening of that event.[21] Consistent with the expectations embodied in the agreed divorce decree, Coburn had actually

---

[21] The agreed divorce decree provides:

> For the period of time while <u>KIRK BRAND COBURN is unemployed</u>, IT IS ORDERED that KIRK BRAND COBURN is obligated to pay and shall pay to JANET MORELAND COBURN child support for two (2) children in the amount of $600.00 per month . . . .
>
> . . . .
>
> **FURTHER, IT IS ORDERED that as soon as KIRK BRAND COBURN gains employment, his monthly child support obligation will be recalculated pursuant to the guidelines as set forth in the Texas Family Code.**

communicated to Moreland, either before or contemporaneously with the execution of the agreed divorce decree, that he was interviewing for a job in Houston. The changed circumstances that are relevant to this case do not involve Coburn's actual income or earning potential; the evidence reflects that those circumstances have remained substantially the same since rendition of the agreed divorce decree. What has changed is that Coburn has voluntarily ceased efforts to find employment that would provide an income sufficient to support his children. Evidence of the change from involuntary unemployment on the date of the agreed divorce decree to voluntary underemployment thereafter is sufficient to support the trial court's finding of a material and substantial change of circumstances. *See, e.g.*, *Baucom v. Crews*, 819 S.W.2d 628, 631 (Tex. App.—Waco 1991, no writ) (proof that circumstances of child or managing conservator have materially and substantially changed is not necessary if there is evidence that obligor's circumstances have materially and substantially changed).

Coburn suggests that the relevant time period for determining whether there has been a material and substantial change of circumstances is fixed as the period of time between the date of the original divorce decree and the date the modification petition was filed. He asserts that, in the present case, his eventual acknowledgment of being voluntarily underemployed falls outside the short 41-day time frame between those events. Using the petition-filing date as an evidentiary cutoff, he intimates that there is evidence only that he was in the process of becoming voluntarily underemployed at that time but no evidence that he was actually voluntarily underemployed until some later date preceding the bench trial.

We are aware that there are several cases stating that the pertinent time period under section 156.401 is the period of time between the date of the order to be modified and "the time the modification is sought." *See, e.g.*, *London v. London*, 94 S.W.3d 139, 144 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (citing *Tucker v. Tucker*, 908 S.W.2d 530, 532 (Tex. App.—San Antonio 1995, writ denied); *Hammond v. Hammond*, 898 S.W.2d 406, 407-08 (Tex. App.—Fort Worth 1995, no writ); *Penick v. Penick*, 780 S.W.2d 407, 408 (Tex. App.—Texarkana 1989, writ denied); *Liveris v. Ross*, 690 S.W.2d 60, 61 (Tex. App.—Houston [14th Dist.] 1985, no writ)). Coburn construes the phrase "the time when modification is sought" as referring exclusively to the date the modification petition was filed, and as a result, he appears to be asserting that the trial court cannot consider evidence arising after that date.

The relevant time frame was not at issue in the cases using the "time when modification is sought" language. We cannot find a single case in which the ending date of the comparative time frame was a substantive issue, let alone one expressly limiting evidence to the circumstances existing on the day the modification suit was filed. Rather, when discussing the evidentiary comparison that is required, many cases have stated that there must be evidence of the relevant party's "current" circumstances, not circumstances at the time the modification petition was filed. *See, e.g.*, *In re C.C.J.*, 244 S.W.3d 911, 917-18 (Tex. App.—Dallas 2008, no pet.) (using both); *Zeifman*, 212 S.W.3d at 594 n.1 ("record must contain both historical and current evidence of the relevant circumstances" in order to make material and substantial change comparison); *London v. London*, 192 S.W.3d 6, 15 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); *see also Hammond*, 898 S.W.2d at 408 (stating that comparison was not possible because father only

33

presented evidence of financial condition at time of modification hearing and not at time of original child-support order). Furthermore, there are cases declaring that the relevant end point is when the modification hearing occurs. *See Swate v. Crook*, 991 S.W.2d 450, 453 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ("The father had the burden of proving a change in his circumstances, which means he was required to present evidence of his financial condition at the time of the 1993 order and evidence of his financial condition at the time of the hearing."), *abrogated on other grounds by Smith v. Brown*, 51 S.W.3d 376, 381 (Tex. App.—Houston [1st Dist.] 2001, pet. denied); *Bradshaw v. Billups*, 587 S.W.2d 61, 62 (Tex. Civ. App.—Eastland 1979, no writ) (relevant time period for determining material and substantial change is date of original decree and time of modification hearing). By and large, the cases Coburn cites do not fairly elucidate what is intended by the phrase "the time when modification is sought," do not tie that particular language to the statutory language, and above all, do not hold that the filing date of the modification petition is an evidentiary or claim cut-off date. In short, these cases are not instructive with respect to the argument Coburn appears to be making. Most importantly, we believe that imposing the cut-off date Coburn suggests would be inconsistent with section 156.401 and the Family Code as a whole.

Section 156.401 authorizes the trial court to modify a child-support order in the event of changed circumstances "*since* . . . the date of the order's rendition" (or on the happening of other events not relevant here). Tex. Fam. Code § 156.401(a)(1)(A) (emphasis added). Pertinent to the circumstances presented in this case, the starting date prescribed by the statute is the date of the order that is being modified, and the end date is, logically, when the trial court actually modifies the support order. *Id.* ("[T]he court may modify an order that provides for the support of a child . . . [if]

34

the circumstances . . . have materially and substantially changed since . . . the date of the order's rendition . . . ."). Nothing in section 156.401 limits the scope of relevant evidence to the circumstances in effect on the date a modification petition is filed, nor is any such limitation found elsewhere in Chapter 156.

Moreover, treating the petition date as an evidentiary cut-off date would be inconsistent with the unique statutory scheme applicable to SAPCR proceedings. In a typical civil case, the date the petition is filed can implicate significant issues like a statute of limitations and the trial court's jurisdiction. In SAPCR proceedings, however, the trial court retains continuing, exclusive jurisdiction to modify a prior final order. *Id.* § 155.001. The only temporal limitation on the court's authority to modify a support order is that circumstances have changed materially and substantially *since* the prior order, and the only limitation on a party's ability to file a modification suit is that the request be in good faith and not for the purpose of harassment. *See id.* §§ 156.005, .401. Given these circumstances, it would be pointless to require successive filings when additional or different facts bearing on the modification request arise while the proceeding is pending.[22] As long as a modification petition is filed in good faith, we see no requirement—and no reason—to limit the trial court's consideration of changed circumstances occurring after the modification suit was filed, if supported by appropriate pleadings. Any mischief that might ensue without the temporal evidentiary limitation Coburn advances would be ameliorated by application of section 156.005 of the Family Code, which requires the trial court to award attorney's fees against a party

---

[22] To the extent such action might be required, Moreland did seek modification of Coburn's child-support obligation shortly before the modification hearing based on changed circumstances, and there was no objection to the amended pleading. *See* Tex. R. Civ. P. 62, 63, 70 (pertaining to amended pleadings).

35

who files a frivolous or harassing modification suit.  *See id.* § 156.005 ("If the court finds that a suit for modification is filed frivolously or is designed to harass a party, the court shall tax attorney's fees as costs against the offending party.").

In sum, under the unique statutory scheme applicable to modification proceedings, there need only be a good-faith basis for instituting a modification suit and, at the end of the day, sufficient evidence that there has been a material and substantial change of circumstances warranting modification of the support order.  *See id.* §§ 156.002 (anyone with standing can file modification suit), .004 (rules of civil procedure apply in modification suit), .005 (trial court must award attorney's fees if modification suit is filed frivolously or is designed to harass a party); *see also* Tex. R. Civ. P. 13 (governing sanctions for frivolous and bad-faith pleadings).  In the present case, there is sufficient evidence that Moreland had a good-faith basis for seeking modification of the child-support order based on (1) the express terms of the agreed divorce decree, (2) Coburn's apparent change in financial conditions shortly after rendition of the agreed divorce decree, and (3) his subsequent refusal to disclose the circumstances of that change.  There is also sufficient evidence that the parties considered Coburn to be involuntarily unemployed on the date of the agreed decree, and since that time he has become voluntarily underemployed.  Accordingly, we hold that the trial court did not abuse its discretion in determining that it was authorized to modify the child-support terms based on a material and substantial change in Coburn's circumstances.

In addition to the foregoing issues, Coburn complains that in increasing his child-support obligation from $600 per month to $2,716.25 per month, the trial court (1) applied an improper legal standard in determining that he was voluntarily underemployed and thus wrongfully

36

"deviated" from the statutory child-support guidelines on that basis, (2) failed to specify the reasons for awarding more than the percentage guideline maximum in section 154.124, (3) incorrectly calculated the children's support needs, and (4) improperly relied on his voluntary support payments under agreed temporary orders. We address these matters in turn.

Section 154.066 of the Family Code provides that "[i]f the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment, the court may apply the support guidelines to the earning potential of the obligor." *Id.* § 154.066(a).[23] At trial, Coburn essentially conceded voluntary underemployment, and he does not dispute that evidence on appeal. Rather, he contends that, in order to conclude that he had *any* monthly net resources, the trial court was required to find that he was voluntarily underemployed *for the purpose of decreasing his child support payments*. In support of this position, however, he relies on several cases subsequently disapproved by the Texas Supreme Court. In *Iliff v. Iliff*, the supreme court held that

> Texas Family Code section 154.066 contains no requirement of proof that an obligor be intentionally unemployed or underemployed for the purposes of avoiding child support. Where a trial court determines that an obligor is intentionally unemployed or underemployed, it is in the court's discretion to set child support based on earning potential.

_____

[23] The same intentional unemployment/underemployment analysis under section 154.066 may be applied in both original child-support orders and modifications of existing child-support orders. *See* Tex. Fam. Code § 156.402 (allowing the court to consider "the child support guidelines . . . under Chapter 154 to determine whether there has been a material or substantial change of circumstances under this chapter that warrants a modification of an existing child support order if the modification is in the best interest of the child").

339 S.W.3d 74, 83 & n.8 (Tex. 2011). The court expressly observed that the limitation Coburn suggests here is found nowhere in section 154.066. *See id.* at 80-81 ("Because section 154.066 is unambiguous, we decline to read into the statute an extra proof requirement that the Legislature did not express."). Coburn contends, however, that *Iliff* does not apply in this case because the facts in *Iliff* involve what he calls a "guidelines" child-support award, rather than a "deviation" from the child-support guidelines, which he says occurred in this case. Although this distinction is likewise absent from the express language of section 154.066, Coburn argues that a more restrictive definition of the term "intentional" is applicable when the trial court awards more than would result from strict application of the percentage guidelines in section 154.125 of the Family Code. Coburn presumes, without any substantive explanation, that a different "intent" standard applies to the extent an obligor's earning potential is found to exceed $7,500 per month.

Although the supreme court has not made the distinction Coburn suggests, it is apparent from the facts in *Iliff* that the child-support award in that case was based on an earning potential that was found to be less than $7,500 per month, which means that the child-support award at issue there was calculated using the percentage guidelines in section 154.125 of the Family Code as applied to the obligor's earning potential. *See id.* at 77. Section 154.125 is "specifically designed to apply to situations in which the obligor's monthly net resources are not greater than $7,500" and prescribes for such individuals a schedule of percentages that presumptively apply to the obligor's net resources, but only "[i]f the obligor's monthly net resources are not greater than [$7,500]." Tex. Fam. Code § 154.125(b). A trial court may, however, deviate from those percentage guidelines if the evidence rebuts the presumption that application of those amounts is in the child's best interest.

38

*See id.* § 154.123(a).  The court may consider a number of specifically delineated factors and "any other reason" in making that determination.  *See id.* § 154.123(b).

In the present case, the court determined that Coburn's earning potential is $200,000 per year and his net resources exceed $12,000 per month.  Based on these findings, which Coburn has not contested, section 154.125 is not applicable.  Consequently, the trial court calculated Coburn's child-support obligation under section 154.126, which provides a bifurcated analysis for determining child support when the obligor's monthly net resources *exceed* $7,500.  Under section 154.126, the court "shall presumptively apply the percentage guidelines [from section 154.125] to the portion of the obligor's net resources that does not exceed [$7,500]."  *Id.* § 154.126(a).  Then, the trial court may, but is not required to, award additional child support based on the child's actual support needs.  *Id.*  If the court so elects, the court must calculate the child's proven needs, subtract the presumptive guideline amount from that figure, and allocate the remainder of the child's proven needs between the parties depending on their income and circumstances.  *Id.* § 154.126(b).  The amount of a child-support award under section 154.126 cannot, however, exceed 100 percent of the child's proven needs.  *Id*.

Accordingly, contrary to Coburn's claim on appeal, the trial court did not deviate from the percentage guidelines; rather, the trial court applied section 154.126 because section 154.125 by its express terms was not applicable.  In accordance with section 154.126, the trial court applied the presumptive percentage guidelines and then exercised its discretion to award additional sums above the percentage guidelines.

Implicit in Coburn's argument is either that the limitation he advances is necessary to avoid inflated child-support awards or that section 154.066 does not apply to child-support awards under section 154.126. We disagree on both counts. In *Iliff*, the supreme court addressed concerns about the potential for unlimited child-support awards based on earning potential and noted that section 154.066 only applies when an obligor makes "significantly less" money because of intentional unemployment or underemployment. *Iliff*, 339 S.W.3d at 82. The court further noted that section 154.066 is permissive and that the trial court's discretion is tempered by the limits set in chapter 154 and by the requirement that there be sufficient evidentiary support for a finding of intentional unemployment or underemployment. *Id.* As an aside, the court further noted that one of the limitations in chapter 154 is that the percentage guidelines in section 154.125 apply only to the first $7,500 of the obligor's net monthly resources. *Id.* at 82 n.7. What was not implicated by the facts in *Iliff*, and thus not discussed, is that even when an obligor has an earning potential in excess of $7,500, child-support awards are not unlimited because they are capped at the proven needs of the child. *See* Tex. Fam. Code § 154.126.

Although not directly stating so, Coburn seems to infer from the lower court's opinion in *Iliff* that the phrase "support guidelines" used in section 154.066 refers only to the percentage guidelines in section 154.125.[24] The supreme court did not make such a holding, and we believe such a construction would be incorrect. Chapter 154 of the Family Code devotes an entire subchapter to what it deems "child support guidelines." *See id.* § 154.121 ("The child support guidelines in this subchapter are intended to guide the court in determining an equitable amount of

---

[24] Coburn does not cite the supreme court's opinion in *Iliff* except as subsequent history for the lower-court opinion.

child support."). The percentage guidelines in section 154.125 play a prominent, but not exclusive, role in the overall support-guideline scheme. Among the support guidelines in chapter 154 is section 154.126, in which the percentage guidelines are but one component of the guidelines for determining child support when the obligor's net resources are in excess of $7,500 per month. Section 154.066 contains no express or implied limitation that restricts its application to awards under section 154.125 or to the percentage guidelines found in that section. Accordingly, we hold that section 154.066 applies to the child-support award in this case, and as the supreme court held in *Iliff*, nothing in that section requires proof that an obligor be intentionally unemployed or underemployed for the purpose of avoiding child support.

We further reject Coburn's contention that the trial court failed to specify its reasons for awarding more than the percentage guideline amount. Under section 154.130 of the Family Code, "if the amount of child support ordered by the court varies from the amount computed by applying the percentage guidelines under section 154.125," the trial court must issue a variety of specific findings, including "the specific reasons that the amount of child support per month ordered by the court varies from the amount computed by applying the percentage guidelines under Section 154.125 or 154.129, as applicable." *Id.* § 154.130(a)(3), (b). In this case, the percentage guidelines under section 154.125 are applicable as a component of the section 154.126 guideline, and the trial court expressly found that (1) Coburn is intentionally underemployed, has the ability to earn $200,000 per year, and has net monthly resources of $12,736.11, (2) application of the percentage guidelines in section 154.125 would be unjust or inappropriate and not in the best interests of the children, (3) the proven needs of the children are $3,557.50 per month, and (4) it is in the children's

41

best interests that Coburn be assigned one half of the children's proven needs above the percentage guideline amount. These findings reveal that the trial court exercised its discretion under section 154.066 to base the child-support obligation on Coburn's earning potential, rather than his actual income; that based on Coburn's earning potential as found by the court, section 154.125 is inapplicable but the percentage guidelines in that section presumptively apply to the first $7,500 of Coburn's net resources, as specified in section 154.126; that the trial court exercised its discretion to award additional child support under section 154.126 based on the children's actual support needs as found by the court; and that the trial court divided the excess support needs equally between the two parents. These findings, which are articulated in both the modification order and the findings of fact and conclusions of law, are specific enough to explain why the trial court awarded child support in excess of the percentage guidelines in section 154.125. This is all that is required under section 154.130.

Next, Coburn challenges the trial court's calculation of the children's support needs. At trial Moreland introduced evidence concerning the actual expenses incurred to support herself and the children each month, including a monthly expense statement she prepared. The expense statement included mortgage and household expenses, food and groceries, clothing, medical and mental-health care and insurance, transportation, life insurance, childcare fees, children's activities and entertainment, and other incidentals such as personal grooming and charitable giving. Considering Moreland's evidence, which showed monthly expenses in excess of $10,000, the trial court determined that some of the expenses could be segregated between Moreland and the children while other expenses were not readily divisible between them. With regard to the non-divisible

expenses, the trial court allocated to the children one-third of the rental, mortgage, household, and transportation expenses and one-half of the expenses for groceries, meals away from home, and incidentals. Expenses attributable solely to the children—including school lunches, life insurance, child care, and summer camps—were fully credited to the children's support needs. The court disregarded expenses that could have been segregated but were not, including medical and mental-health care, clothing, and shoes. Ultimately, the trial court determined that E.C.'s and P.C.'s proven needs are $3,557.50 per month. As required by section 154.126, the trial court subtracted the percentage guideline maximum of $1,875 from this figure, then divided the excess support needs equally between the parents to arrive at Coburn's modified support obligation of $2,716.25.

Coburn complains that the trial court arbitrarily allocated one-third of the mortgage and transportation expenses to the children and 100% of the life insurance to the children. He also complains that the trial court improperly included "lifestyle" expenses for maid service, cable television, yard maintenance, caretaking of the household, cleaning supplies, vehicle maintenance, car insurance, and life insurance, which he contends are not properly considered to be "needs" of the children. Although we question whether Coburn properly preserved these complaints for appellate review,[25] nonetheless, assuming that he did, we hold that the trial court's allocations were reasonable and that the inclusion of the disputed expense categories was not an abuse of discretion.

---

[25] In the trial court, Coburn complained about the admission of Moreland's expenses exhibit to the extent it was offered "as a summary of her testimony." Coburn also generally challenged the legal and factual sufficiency of the evidence to support the needs calculation and requested that the language in the order be "modified to reflect that the needs of the children were not proven." Coburn did not, however, make the specific complaints that he now makes on appeal. *See* Tex. R. App. P. 33.1 (timely, specific objection required to preserve issue for appellate review).

The phrase "needs of the child" is not defined in the Family Code, but courts have long held that it is not limited to the "bare necessities of life." *Rodriguez v. Rodriguez*, 860 S.W.2d 414, 417 n.3 (Tex. 1993) (applying prior version of Family Code that included similar language). As a result, the trial court must determine what the needs are on a case-by-case basis by following the "paramount guiding principle: *the best interest of the child*." *Id*. Coburn points to no authority that requires segregation of non-divisible expenses, prohibits the trial court from making a reasonable allocation of non-divisible expenses, or prohibits the court from considering the disputed expenses as needs of the children. Indeed, while the phrase "needs of the child" is not so expansive as to encompass the most extravagant demands, the trial court is given broad discretion to determine what a child's reasonable needs are. *See MacGillivray v. MacGillivray*, No. 04-10-00109-CV, 2011 WL 2150352, at *3 (Tex. App.—San Antonio, June 1, 2011, pet. denied) (mem. op.); *Dolan v. Martine*, No. 03-03-00112-CV, 2004 WL 314972, at *3 (Tex. App.—Austin Feb. 20, 2004, no pet.) (mem. op.). We hold that the trial court's findings related to E.C.'s and P.C.'s support needs are within the reasonable bounds of its broad discretionary authority and the evidence presented.[26]

---

[26] We further note that, even if the disputed expenses were excluded, the trial court did not require Coburn to pay an amount in excess of 100 percent of the proven needs of the children in violation of section 124.126(b). Without an objection advising the trial court of the complaints Coburn now raises, we would be disinclined to reverse for the trial court to make a different allocation of the children's support needs in excess of the presumptive percentage-guideline maximum. *See Scott v. Younts*, 926 S.W.2d 415, 422 (Tex. App.—Corpus Christi 1996, writ denied) (court did not abuse its discretion in setting support amount where amount awarded was less than 100 percent of child's proven needs and was within statutorily required calculations).

In Coburn's final challenge to the child-support award, he contends the trial court improperly considered his voluntary payment of $1,875 per month when it increased his child-support obligation to $2,716.25 per month. The Family Code specifically provides that "[a] history of support voluntarily provided in excess of the court order does not constitute cause to increase the amount of an existing child support order." Tex. Fam. Code § 156.403. Thus, any voluntary payments made by Coburn in the past do not provide a basis to increase the amount of child support. Coburn alleges that the trial court expressly relied on his voluntary support payments in violation of section 156.403, citing the following provision in the trial court's modification order:

> IT IS ORDERED that the child support increase under the Temporary Orders filed in this case is acknowledged as KIRK COBURN'S voluntary increase and IT IS ORDERED that the child support was increased retroactively for each month that child support was paid to match the actual child support received by JANET MORELAND. The Court finds that there is no arrearage or overpayment as of June 30, 2012.

Thus, in the modification order, the trial court expressly acknowledged that Coburn's payment of $1,875 under the prior temporary orders was voluntary and ordered that child support was retroactively increased only to the extent of matching amounts actually paid *so as to eliminate any dispute as to an arrearage or overpayment*. In finding of fact 45, the trial court likewise determined that there was no arrearage or overpayment of child support as of June 30, 2012. The increased child-support obligation of $2,716.25 per month was ordered to begin on July 1, 2012, and was not made retroactive. The trial court never cited Coburn's voluntary payment as a basis for calculating child-support going forward, and no reasonable inference to the contrary is found in the record. We conclude that neither the modification order nor the trial court's findings of fact and

45

conclusions of law supports Coburn's claim that the trial court based the modified child-support obligation, in whole or part, on his agreement to voluntarily increase his support payments while the modification suit was pending.

In any case, as previously discussed, the trial court's support order is amply supported by sections 154.126 and 154.066 of the Family Code as applied to the court's findings of voluntary underemployment, earning capacity of $200,000 per year, net resources of $12,736.11, the children's proven needs of $3,557.50 per month, and equitable division of the children's additional support needs. *See id.* §§ 154.066 (governing intentional unemployment or underemployment), .126 (governing application of guidelines to net resources exceeding $7,500 per month).[27] Consequently, we conclude that Coburn's complaint about his voluntary support payments is without merit.

Because some evidence of a substantive and probative character supports the trial court's child-support award, Coburn has failed to show that the trial court abused its discretion. Accordingly, we overrule Coburn's third issue.

### Attorney's Fee Award

In Coburn's final appellate issue, he contends the trial court abused its discretion when it awarded Moreland a significant portion of her attorney's fees because she was not the "successful" or "prevailing" party and no finding of "good cause" was made or supported by the

---

[27] To the extent one could read the trial court's modification order in the way Coburn suggests, we observe that he submitted to the trial court a proposed order using identical language and represented that the order remedied his objections to a proposed order previously submitted by Moreland's counsel. Although Coburn objected to other aspects of the child-support provisions in an accompanying letter and in various motions filed with the trial court, he never complained that the trial court violated section 156.403 or improperly considered his voluntary support payments. Thus, we conclude in the alternative that the complaint is waived. *See* Tex. R. App. P. 33.1.

46

record. Although Moreland successfully defended Coburn's modification counter-petition and was afforded material relief on her own petition, the trial court denied her requests to be granted several exclusive decision-making rights and her request that Coburn be required to exercise possession in Travis County and take the children to their extracurricular activities and events during that time. The trial court also awarded Moreland slightly more than one-third of the increased child support she requested.[28] Because Moreland was awarded less than all the relief she had requested, Coburn contends that she is not a "prevailing party" and that the trial court was required to find both "good cause" to award her any amount of attorney's fees and that the fees awarded were incurred "for the benefit of the children." We disagree.

Under the Family Code, the trial court has discretion to "render judgment for reasonable attorney's fees and expenses and order the judgment and postjudgment interest to be paid directly to an attorney." *Id.* § 106.002; *Bruni v. Bruni,* 924 S.W.2d 366, 368 (Tex. 1996) (award of attorney's fees is in trial court's discretion). As Moreland observes, section 106.002 does not include language imposing either a "prevailing party" or "good cause" requirement, and we are not persuaded that these standards should be read into section 106.002, as Coburn suggests. *Compare* Tex. Fam. Code § 106.002 *with id.* §§ 152.312 ("The court shall award the prevailing party . . . necessary and reasonable expenses . . . including . . . attorney's fees . . . , unless the party from whom fees or expenses are sought establishes that the award would be clearly inappropriate.")*,* 154.012 (requiring court to award attorney's fees to obligor if obligee fails to return excess child-support

---

[28] Moreland's live pleading requests only recalculation of the child-support obligation and does not specify a particular amount of child support; however, she testified at trial that she was seeking $6,000 per month in child support.

payment unless court finds "good cause" and "states the reasons supporting that finding"), *and* 157.167 (mandating award of attorney's fees in child-support enforcement action if complainant prevails unless court finds "good cause"and "states the reasons supporting that finding"); *cf. generally Tucker v. Thomas*, 419 S.W.3d 292, 296-300 (Tex. 2013) (discussing and affording legal significance to textual differences in various attorney's fees provisions in Family Code). When the legislature intends to impose a prevailing-party or good-cause requirement, it does so with express language.[29]

Although Coburn cites Family Code cases that have employed a "successful party" or "good cause" analysis, those cases have either (1) applied prior versions of section 106.002 that required an award of attorney's fees to be "taxed as costs" or (2) relied on cases that had applied

---

[29] *Cf., e.g.*, Tex. Alco. Bev. Code § 28.081(b) ("The court shall award the prevailing party in an action under this section attorney's fees and costs of action."); *id.* § 102.79(c) ("The prevailing party . . . shall be entitled to . . . reasonable attorney's fees . . . ."); Tex. Bus. & Com. Code § 5.111(e) ("Reasonable attorney's fees . . . may be awarded to the prevailing party . . . ."); *id.* §§ 16.102(d)(2), .104(c)(2) (authorizing trial court to "award reasonable attorney's fees to the prevailing party"); *id.* § 20.08(c) ("A prevailing party . . . shall be compensated for the party's attorney fees . . . ."); *id.* § 21A.002(d) ("[A] prevailing party in an action to void a deed under this section may recover reasonable and necessary attorney's fees."); Tex. Civ. Prac. & Rem. Code §§ 16.034, 30.021, 106.002(b), 125.003(d), 125.068, 134A.005 (depending on circumstances, trial court may or must award reasonable attorney's fees to "prevailing party"); Tex. Est. Code § 124.018 ("The court shall award . . . reasonable attorney's fees [] to the prevailing party . . . ."); Tex. Fam. Code § 8.0591 (requiring court to award attorney's fees to obligor if obligee fails to return excess spousal-maintenance payment unless "good cause shown" and "court states . . . the reasons" supporting good-cause finding); Tex. Gov't Code § 423.006(d) ("[T]he court shall award court costs and reasonable attorney's fees to the prevailing party."); Tex. Health & Safety Code §§ 365.005(b), .015(c), .017(f), 757.012(b) (authorizing award of attorney's fees to "prevailing party" in various actions); Tex. Lab. Code § 21.259(a) ("[A] court may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."); Tex. Prop. Code § 5.006(a) ("[T]he court shall allow to a prevailing party who asserted the action reasonable attorney's fees . . . .").

prior versions of the statute.[30]  *See, e.g.*, *In re M.A.N.M.*, 231 S.W.3d 562, 566 (Tex. App.—Dallas

2007, no pet.); *Carlson v. Carlson*, 983 S.W.2d 304, 308-09 (Tex. App.—Houston [1st Dist.] 1998,

no pet.); *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 583-84 (Tex. App.—Houston [1st Dist.] 1997,

pet. denied); *Marichal v. Marichal*, 832 S.W.2d 797, 798 (Tex. App.—Houston [14th Dist.] 1992,

no writ); *Goheen v. Koester*, 794 S.W.2d 830, 835 (Tex. App.—Dallas 1990, writ denied); *Marichal

v. Marichal*, 768 S.W.2d 383, 385 (Tex. App.—Houston [14th Dist.] 1989, writ denied); *Reames

v. Reames*, 604 S.W.2d 335, 336-37 (Tex. Civ. App.—Dallas 1980, no writ).   Although prior

versions of section 106.002 allowed recovery of attorney's fees as "costs," the current version of the

Family Code does not and instead distinguishes between costs and attorney's fees.  *See* Tex. Fam.

Code §§ 106.001 (award of costs), .002 (award of attorney's fees and expenses); *cf. id.* § 156.005

("If the court finds that a suit for modification is filed frivolously or is designed to harass a party, the

court shall tax attorney's fees as costs against the offending party.").  As a result, the attorney's fees

the trial court awarded in this case are not considered to be "costs."  *Cf. In re Nalle Plastics Family

Ltd. P'ship*, 406 S.W.3d 168, 175-76 (Tex. 2013).  This distinction is significant because specific

---

[30]  In 1973 the legislature enacted section 11.18(a) of the Family Code, which provided:  "In any proceeding under this subtitle, the court may award costs as in other civil cases.  Reasonable attorney's fees may be taxed as costs . . . ."  Act of June 15, 1973, 63d Leg., R.S., ch. 543, § 1, 1973 Tex. Gen. Laws 1411, 1419.  In 1981 section 11.18(a) was amended to omit the "as in other civil cases" language.  Act of June 10, 1981, 67th Leg., R.S., ch. 356, § 3, 1981 Tex. Gen. Laws 942, 944.  In 1995 section 11.18(a) was recodified into two newly numbered provisions—section 106.001, governing costs to be awarded "in the same manner as in other civil cases in a suit," and section 106.002, governing attorney's fees awarded "as costs."  Act of Apr. 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 133.  The statute was amended to its current form in 2003, with the "as costs" language removed and replaced with "and expenses."  Act of June 20, 2003, 78th Leg., R.S., ch. 478, § 1, 2003 Tex. Gen. Laws 1744, 1744.  As presently worded, section 106.001, governing costs, no longer includes the "as in other civil cases" language.  *See* Tex. Fam. Code § 106.001.

rules of procedure apply to awards of costs, and it is evident that the "successful party" and "good cause" requirements reflected in the cited cases were derived from those rules. *See* Tex. R. Civ. P. 131 ("The successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided."), 141 ("The court may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules."); *see also Reames*, 604 S.W.2d at 337 (applying rules 131 and 141 to original version of section 106.002, which provided that "'[r]easonable attorney's fees may be taxed as costs'" and that costs may be awarded "as in other civil cases"). Because attorney's fees are not taxed as costs under the present incarnation of section 106.002, neither the rules of procedure governing cost awards nor case law applying those rules are applicable in this case.

Moreover, when attorney's fees were still being taxed as costs under the immediately preceding version of section 161.002, several courts observed that the statute "[did] not require a family court judgment to state good cause for adjudging costs against the successful party as is required in other civil cases" because "the legislature recognized the difficulty of deciding, in family cases, which party is successful." *Billeaud v. Billeaud*, 697 S.W.2d 652, 655 (Tex. App.—Houston [1st Dist.] 1985, no writ) (discussing amendment to former version of statute that deleted language requiring costs to be awarded "as in other civil cases"); *see also, e.g.*, *Nichol v. Nichol*, No. 07-12-00035-CV, 2014 WL 199652, at *5 (Tex. App.—Amarillo Jan. 15, 2014, no pet.) (mem. op.) (observing that "good cause" requirement had been superseded by statutory amendment in 1981 when legislature removed "as in other civil cases" language from prior version of statute); *Carlson*, 983 S.W.2d at 308-09 (quoting *Billeaud*, 697 S.W.2d at 655). Although success on the merits and

good cause may be relevant in considering whether a trial court abused its discretion in awarding one party its attorney's fees under section 106.002, those are not compulsory requirements under the statute as presently worded.

Even in cases applying a "successful party" analysis, we discern no requirement that a party win on all or even most of the requested relief. The absence of a bright-line rule (or even an articulable rule) in these cases is consistent with the broad discretion trial courts are afforded in awarding attorney's fees in SAPCR proceedings. *Cf. Lenz v. Lenz*, 79 S.W.3d 10, 21 (Tex. 2002). It is further consistent with the legislature's recognition that it is often difficult to identify a "successful party" in SAPCR proceedings, *see Billeaud*, 697 S.W.2d at 655, and with the principle that the trial court is in the best position "to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Rarely is one party a clear-cut "winner" in a SAPCR proceeding, and the present case is no exception. Neither Moreland nor Coburn was a total victor. Although both prevailed to a degree, Coburn acknowledges that Moreland achieved significant victory and repeatedly complains on appeal that the trial court's order was "one-sided." Even without this concession, it is evident that Moreland prevailed in substantial and material ways, both in prosecuting her own modification petition and in defending against Coburn's counter-petition. There is also more than enough evidence to support the trial court's finding that the attorney's fees awarded to Moreland were incurred "in order to protect the safety and welfare of the children who are the subject of this suit." In light of the record before the trial court and the deferential standard of review, we cannot conclude

that the trial court abused its discretion in awarding Moreland the majority of her attorney's fees. We therefore overrule appellate issue four.

## CONCLUSION

Based on the foregoing analysis, we vacate the portion of the trial court's judgment modifying Coburn's possession and access to E.C. and P.C. and dismiss as moot that portion of the appeal. Finding no abuse of discretion as asserted in appellate issues two, three, and four, we affirm the remainder of the trial court's modification order.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Field

Affirmed in Part; Vacated and Dismissed in Part

Filed: May 23, 2014