**Affirm in part, Reverse in part, and Remand; Opinion Filed March 11, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-17-01224-CV

### IN THE INTEREST OF D.T., A CHILD

**On Appeal from the 330th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-13-12945**

## MEMORANDUM OPINION

Before Justices Whitehill, Molberg, and Reichek
Opinion by Justice Molberg

A.T. (Father) appeals the trial court's determinations of conservatorship of the parties' minor child (D.T.), and of child support, in a final divorce decree dissolving his marriage to V.V. (Mother). In two issues, Father asserts the trial court abused its discretion in granting Mother the exclusive right to designate D.T.'s primary residence and in ordering Father to pay Mother monthly child support in the amount of $1,450.

We reverse the portion of the trial court's final divorce decree pertaining to Father's monthly child support obligations, and remand to the trial court for further proceedings consistent with this opinion. In all other respects, we affirm the final divorce decree.

### BACKGROUND

Father and Mother were married on or about September 29, 2009. D.T. was born on July 30, 2010. The parties ceased living together on or about July 5, 2013. Mother filed an Original Petition for divorce on July 9, 2013, and a First Amended Original Petition for Divorce on March

27, 2015 (petition). Father filed an Original Counter-Petition for Divorce on July 19, 2013 (counter-petition). Mother sought sole managing conservatorship of D.T., "with all the rights and duties of a parent sole managing conservator," which includes the exclusive right to designate the child's primary residence. *See* TEX. FAM. CODE ANN. § 153.132(1). Father requested the trial court to appoint the parties joint managing conservators, and grant him the exclusive right to designate D.T.'s primary residence. Both parties requested that the other party be ordered to make child support payments.

Mother's petition alleged Father had "a history of committing family violence," accused Father of "cruel treatment," and asked the trial court "to deny [Father] access to [D.T.]." Alternatively, Mother requested the trial court to order supervised visitation and require Father to attend a "battering intervention and prevention program." In affidavits attached to her petition, Mother testified that Father filed a false report with Child Protective Services, accusing her of mistreating D.T. and her son from a previous marriage. Mother also testified by affidavit that she believed Father would remove D.T. from the United States.[1] Father's counter-petition accused Mother of "cruel treatment." Father requested the trial court to order a psychological evaluation of Mother, and order the parties to attend a parent education and family stabilization course.

The parties' inability to peaceably co-parent D.T. resulted in the trial court and its associate judge issuing various orders, ranging from requiring the parties to attend parenting classes, to ordering that Mother be permitted to attend D.T.'s birthday party. In temporary orders dated November 11, 2013, the trial court, among other things:

- ordered Dallas County Family Court Services to prepare a "social study into the circumstances and condition of [D.T.]" and Father's and Mother's respective homes;

---

[1] The Dallas County Family District Court Standing Order, applicable to every divorce suit and every suit affecting the parent-child relationship, prohibits the parties from removing any child the subject of the case from the State of Texas.

- ordered a psychological evaluation of Father and of Mother; and

- ordered Father and Mother to complete a parenting education and family stabilization course.

In its November 2013 temporary orders, the trial court found that "good cause exists for no child support to be ordered at this time," but ordered both parties to provide medical support for D.T. In a report dated August 24, 2015, the associate judge ordered Father and Mother to attend a parenting class; appointed Sandra Benson as D.T.'s counselor[2]; and ordered that D.T. "must sleep in her own bed at Father's residence."[3]

In September 2013 and October 2014, the trial court ordered Dr. Donna Milburn, a clinical and forensic psychologist, to conduct psychological evaluations on Father and Mother, and prepare reports summarizing her findings. Dr. Milburn produced her first report on January 28, 2014, and her second on August 29, 2015. Both were admitted into evidence at trial. Pursuant to court orders, Dr. Catherine Collins, a Dallas County Family Court Services counselor, prepared two child custody evaluations of D.T.[4] Portions of Dr. Collins' reports were read into the record at trial, a summary of the reports was admitted as evidence, and the trial court "[took] judicial notice of the filing of [Dr. Collins'] social study in the [trial court's] record on July 22, 2014." Additionally, Dr. Milburn's August 2015 report addressed and summarized portions of Dr. Collins' July 2014 report.

In temporary orders dated February 24, 2016, the trial court ordered the parties to attend a "Conflict Resolution and Parallel Parenting Program" conducted by Dr. Linda Threats, a court-appointed psychotherapist and parent facilitator. An associate judge's report dated July 11, 2016,

---

[2] Benson was also a counselor for Mother's son by a previous marriage.

[3] Dr. Donna Milburn's January 2014 psychological evaluation report, *see infra*, noted that Father "sleeps with" D.T. At a temporary orders hearing, Benson testified D.T. said "she sleeps with [Father]" in the same bed.

[4] The trial transcript and Dr. Milburn's August 2015 psychological evaluation report indicate Dr. Collins filed two child custody evaluations, on July 22, 2014, and on December 30, 2015. Father attached a copy of Dr. Collins' December 2015 report to his brief on appeal.

ordered that Mother "have access" to D.T. from noon to 6:30 p.m. on D.T.'s birthday, that "Mother get [D.T.] ready for the party," and that Mother "can attend [D.T.'s] birthday party."

The trial court conducted a bench trial in February 2017. The parties presented evidence on, among other things, conservatorship and child support. The trial court heard the testimony of Mother, Father, Dr. Milburn, and Dr. Threats, among others. The evidence at trial included psychological evaluations, social study reports, and counseling reports regarding D.T., Father, and Mother, prepared by Dr. Milburn, Dr. Collins, and Benson. Portions of Dr. Milburn's, Dr. Collins', and Benson's reports were read into the record at trial. Transcripts of temporary orders hearings in August 2013 and November 2015 were introduced into evidence, and included the testimony of Benson, Samina Yasmin, D.T.'s former babysitter, and Jackie Day, Mother's former neighbor. Portions of Benson's, Yasmin's and Day's testimony were read into the record.

At trial, Mother testified that both during the marriage and after the parties separated, Father yelled at her and called her "sister fucker, motherfucker, [and] bitch." According to Mother, "[Father] called [her] bitch so many times that [D.T.] started calling [her] bitch. [D.T.] thought that [was Mother's] name." Mother told the trial court that Father "engaged in pushing and pulling during the marriage." According to Mother, Father was not involved in D.T.'s extracurricular activities.

In his trial testimony, Father admitted he had called Mother a "sister fucker" in the past, "yelled at her and cursed at her." Father testified that Mother called him "the Indian version of fucker," "bait[ed him] into losing [his] temper," and allowed D.T. to go to school when she was sick. According to Father, Mother does not "wan[t] what's best for [D.T.]." However, Father also confirmed, "[Mother] is a good mom."

Dr. Milburn testified that she recommended in both her January 2014 and August 2015 psychological evaluation reports that Father be appointed the primary possessory parent.

–4–

According to Dr. Milburn, D.T. appeared to have a stronger bond with Father, and "seemed . . . joyful and happy" when she was playing with Father. In contrast, D.T. "seemed angry" while playing with Mother. Dr. Milburn also believed the information Father provided "seemed to be more consistent" with other information and evidence she obtained. Conversely, the information Mother provided "changed quite a bit [d]epending on what sort of story she was telling," and some things Mother said "turned out to not be accurate." Dr. Milburn's impression of Mother was "that she would say and do whatever she needed to, to be able to achieve her goal of having [Dr. Milburn] recommend that she be the primary custodial parent."

Dr. Milburn testified that in her first evaluation, when D.T. was two-and-one-half years old, Father admitted he "was sleeping with [D.T.] in the same bed." Dr. Milburn knew Father "was involved in abusing another female in India." Dr. Milburn told the trial court that Mother made an allegation of sexual abuse by Father, but the "information [she provided] called [into] question . . . whether or not that was an accurate allegation." The trial court questioned Dr. Milburn about the sexual abuse allegations. According to Dr. Milburn, Mother alleged that D.T. was "taking a shower with [Father], that he masturbated in front of [D.T.] and that he ejaculated in front of [D.T.]." D.T. told Dr. Milburn she had never taken a shower with Father.

Dr. Threats testified Father tended to be "compulsive," a perfectionist, "controlling, yet indulging," could be "unbending in some areas," and tended to believe "there's an absolute correct solution for problems." According to Dr. Threats, after working with Father for "a period of time," "he was able to integrate new learning based on experiences." While Dr. Threats considered Father to be "hardworking, duty bound, [and] dependable," he also could be stubborn, and have "difficulty managing his anger at times." Dr. Threats testified Mother "respond[ed] well to positive reinforcement," tended to be "pleasing and loyal to authority figures," "was able to integrate new learning, based on experience," and was "achievement oriented." According to Dr.

Threats, while Mother tended to "eagerly respond to new ideas and suggestions [from] others" and was "friendly and sociable," she also "may use guilt and manipulation at times to get what she wants."

A transcript of Benson's testimony from the November 2015 temporary orders hearing was admitted into evidence at trial, and portions of her testimony were read into the record. With respect to her counseling sessions with D.T. and Mother's son, Benson's testimony at the temporary orders hearing included the following:

- Mother's son witnessed Father hit and kick Mother, and pull Mother's hair.

- Mother's son was afraid of Father.

- Benson was "concerned about family violence that went on between [Father and Mother] in the household."

- Both D.T. and Mother's son told Benson about family violence, and they were "concerned about what was happening to their mother."

- D.T. told Benson "she sleeps with [Father]," and Benson considered it "inappropriate" for D.T. to sleep with Father.

Benson's written psychological evaluation of Mother's son was admitted into evidence at trial. Benson's report stated:

- Mother's son "has seen his mother and his sister abused."

- Father "hit him on his head and on his buttock every day, had kicked him, and called him bad names in Hindi. These allegations have been supported by videos and transcripts."

- Mother's son "was fearful when [Father] moved into the same apartment complex as [Mother]."

- "[Mother] has been involved in her children's lives by providing . . . playdates, family nights, church, and trips together."

A summary of Dr. Collins' child custody evaluation reports was admitted into evidence at trial, and portions of the reports were read into the record. Dr. Collins' reports noted strengths and

areas of concern for both Father's and Mother's parenting of D.T. Dr. Collins' observations, conclusions, and recommendations included the following:

- "There is some evidence that the father may have physically abused the mother. It is likely that he, in the least, was verbally abusive and may have engaged in pushing or pulling."

- "Due to the mother's seeming weaker relationship [with D.T., D.T.] would probably be happiest if the mother had extended standard possession. The father appears more attentive and more playful."

- "The greatest concern about [Father] is the [a]lienating remarks he will make to [D.T.] about [Mother]. As this concern was in the first social study and the same behavior occurred in the update[d] observation, it appears [Father] will have a great deal of difficulty correcting it."

- "[I]t is difficult to recommend the father have more time with [D.T.] because it is very likely the father will strongly alienate [D.T.] from the mother. . . . He will alarm [D.T.] to false dangers that the mother poses, increase her anxiety and anger in the mother's care, and lead her to reject visitation. He may also over-indulge her to develop a preference for him."

Dr. Collins' report stated she was "inconclusive regarding whether family violence has occurred," and would "[defer] to the jury to determine the mother's witnesses' credibility with cross examination. While there is some doubt about credibility, multiple witnesses lend some weight."

A transcript of Yasmin's testimony from the August 2013 temporary orders hearing was admitted into evidence at trial, and portions of her testimony were read into the record. Yasmin was D.T.'s babysitter from February 2011 to October 2012. At the temporary orders hearing, Yasmin testified she cared for D.T. from 8 a.m., when Mother left her home for work, until 5 p.m., when Mother returned home from work. Although Father was at home for a portion of the time Yasmin cared for D.T., he did not feed, bathe, or otherwise care for D.T. Yasmin saw Father slap D.T. on the face once, when D.T. did not obey him. Yasmin considered Mother to be a "good" parent, but not Father. Yasmin observed bruises on Mother "[q]uite a few times."

A transcript of Day's testimony from the August 2013 temporary orders hearing was admitted into evidence at trial, and portions of her testimony were read into the record. At the temporary orders hearing, Day testified she observed bruises on Mother's face and neck in August 2012 and February 2013. According to Day, Mother said she got an abortion because Father "hit her in the stomach." Day observed Father yelling at Mother on "two or three" occasions. Day said Father was a "good father . . . some of the time," and Mother was a "good mother all of the time."

At trial, there was limited evidence with respect to Father's income. Mother testified that, according to "the last income tax statement," Father made $91,000 a year. Father did not testify or otherwise provide evidence of his income at trial. However, at the August 2013 temporary orders hearing, Father testified he "ma[d]e . . . [$]74,500," but also testified that he and Mother were "making the same amount of money . . . between [$]100- and 150,000." Father did not provide a copy of his pay stub at the hearing. Dr. Collins' December 2015 child custody evaluation report included a form completed by Father on which he listed his employment history and stated his gross monthly income "From Employment" as $3,718.75 and net monthly income "From Employment" as $2,704.92, but noted "Present Employer details not provided."

Prior to announcing its judgment, the trial court told the parties it had read "the entirety of the file" and "[e]very bit of that social study that was before this Court." The trial court stated the orders that were "put in place" were for the child's best interest. Addressing Father, the trial court noted, "you think that [Mother] is a good mother because you said she was." The trial court stated that although "there [are] some issues with her credibility," there were also "too many instances where someone, other than mom, is talking about some abuse," and it "wish[ed it] had heard [Father] say . . . that did not happen." The trial court recalled Dr. Threat's testimony that Father could be "unbending," "difficult," and believed in "an absolute correct solution," and noted Dr.

–8–

Threat's testimony was consistent with the findings in the "social study." Reminding Father that he no longer shared a home with Mother, the trial court told Father that, while it believed he loved D.T., he "can't control what happens in [Mother's] home."

The trial court granted the divorce and dissolved the parties' marriage on the ground of insupportability. Relevant to this appeal, the divorce decree appointed Mother and Father joint managing conservators of D.T. Mother was granted the exclusive right to designate D.T.'s primary residence within Dallas or contiguous counties. Father was ordered to pay Mother monthly child support in the amount of $1,450. Mother was ordered to provide and pay for D.T.'s health insurance. Father filed a motion for new trial, which was overruled by operation of law. The parties did not request findings of fact and conclusions of law. This appeal followed.

## STANDARD OF REVIEW

Father challenges the sufficiency of the evidence to support the trial court's order granting Mother the exclusive right to designate D.T.'s primary residence, and ordering Father to pay Mother monthly child support in the amount of $1,450. We review a trial court's decision regarding these issues under an abuse of discretion standard. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam) (child support); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (conservatorship, control, possession, and access); *In re K.L.W.*, 301 S.W.3d 423, 424 (Tex. App.—Dallas 2009, no pet.) (custody, control, possession, and visitation). The trial court has wide discretion in determining what is in the best interest of the child, and we will not disturb the trial court's order absent an abuse of discretion. *In re E.R.C.*, 496 S.W.3d 270, 283–84 (Tex. App.—Texarkana 2016, pet. denied). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Worford*, 801 S.W.2d at 109; *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.); *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.). When reviewing for an abuse of discretion, "legal and factual sufficiency of the

–9–

evidence are not independent grounds for asserting error but are relevant factors in determining whether the trial court abused its discretion." *Coburn*, 433 S.W.3d at 823; *see also E.T.-M. v. Texas Dep't of Fam. & Protective Services*, No. 03-18-000622-CV, 2019 WL 988222, at *2 (Tex. App.—Austin Mar. 1, 2019, n.p.h.).

In considering whether the trial court abused its discretion, we determine: (1) whether there was sufficient evidence upon which to exercise its discretion, and if there was, (2) whether the application of its discretion was erroneous. *Vardiolos v. Vardiolos*, 219 S.W.3d 920, 921 (Tex. App.—Dallas 2007, no pet.); *Coburn*, 433 S.W.3d at 823. We consider only the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence. *Coburn*, 433 S.W.3d at 823. A trial court does not abuse its discretion when it makes a decision based on conflicting evidence, *Bailey v. Rodriguez*, 351 S.W.3d 424, 426 (Tex. App.—El Paso 2011, no pet.); *In re M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.), or when some substantive and probative evidence supports its decision, *In re C.C.J.*, 244 S.W.3d 911, 917 (Tex. App.—Dallas 2008, no pet.); *Coburn*, 433 S.W.3d at 823. Further, in a bench trial, the trial court is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *In re E.R.C.*, 496 S.W.3d at 284. We, therefore, defer to the trial court's judgment with respect to factual resolutions that may have been affected by the trial court's credibility determinations. *Id.*

In a bench trial where the record contains no findings of fact and conclusions of law, all necessary findings of fact to support the trial court's judgment are implied. *Worford*, 801 S.W.2d at 109; *Burns v. Burns*, 116 S.W.3d 916, 920 (Tex. App.—Dallas 2003, no pet.). "[E]very reasonable inference and intendment supported by the record will be drawn in favor of the trial court's judgment." *Burns*, 116 S.W.3d at 920 (quoting *Black v. Dallas Cty. Child Welfare Unit*, 835 S.W.2d 626, 630 (Tex. 1992)). We will uphold the judgment on any legal theory that finds

support in the record. *Weisfield v. Tex. Land. Fin. Co.*, 162 S.W.3d 379, 381 (Tex. App.—Dallas 2005, no pet.); *Burns*, 116 S.W.3d at 920 ("In a nonjury trial 'every reasonable inference and intendment supported by the record will be drawn in favor of the trial court's judgment.'") (quoting *Black*, 835 S.W.2d at 630)

## RIGHT TO ESTABLISH CHILD'S PRIMARY RESIDENCE

In his first issue, Father contends the trial court abused its discretion by appointing Mother joint managing conservator with the exclusive right to establish D.T.'s primary residence.

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002. The trial court is vested with broad discretion to determine which conservator will have the exclusive right to establish the child's primary residence, so as to effectuate the best interest of the child. *In re K.L.W.*, 301 S.W.3d at 428; *see also Pena v. Pena*, 8 S.W.3d 639, 639 (Tex. 1999) (per curiam) ("the trial court is vested with wide discretion in determining custody issues"). The trial court's judgment will be disturbed only where the record as a whole shows that the trial court abused its discretion. *Gillespie*, 644 S.W.2d at 451; *In re K.L.W.*, 301 S.W.3d at 424.

Father claims the trial court abused its discretion by designating Mother "as [D.T.'s] Primary Managing Conservator"[5] because psychological evaluations by Dr. Milburn and Dr. Collins indicated Father was best suited to have "primary possession" of D.T. The evidence shows that both Father and Mother contributed to the problems they had co-parenting D.T., and the witnesses presented conflicting evidence. Although Dr. Milburn recommended that Father and Mother be joint managing conservators, with Father having "primary possession" of D.T, her

---

[5] The trial court did not designate Mother as D.T.'s "Primary Managing Conservator." Rather, Father and Mother were appointed joint managing conservators, with Mother having the exclusive right to establish D.T.'s primary residence within Dallas and contiguous counties.

psychological evaluations of Father observed that he "had a history of misrepresenting his past work on a resume to gain employment and there is a filed legal report from a first wife in India claiming that he was physically violent with her." Dr. Milburn also opined that Father "tend[ed] to be outspoken about what he believes and may tend to be emotionally reactive to situations that do not go as he wants"; Father "may tend to do or say whatever he thinks will gain him the outcome he desires"; and Father "may have difficulty managing his anger and at times can become overwhelmed and have an outburst of anger." Dr. Milburn opined that Mother "seem[ed] to prioritiz[e] her own wants and emotions above those of others"; Mother "ha[d] some fluctuations in mood that may interfere with her ability to focus at times"; and Mother "appear[ed] to have some difficulty managing frustration and anger." Dr. Milburn, however, also observed that Mother is "an emotionally sensitive individual most of the time and her behavior remained consistent throughout the evaluation."

Dr. Collins' report expressed deep concern that Father "has tried to damage" D.T.'s relationship with Mother, and made statements to D.T. to alienate her from Mother. Dr. Collins believed Father would "have a great deal of difficulty correcting" this behavior. Even during Dr. Collins' "family observations, [Father] portrayed [Mother] negatively in D.T.'s presence, instilled anxiety, and urged her to correct [Mother]." Dr. Collins did not recommend that Father have primary possession of D.T., as Father suggests in his brief on appeal. Rather, Dr. Collins stated D.T. "would probably be happiest" if Mother had extended standard visitation, but "it is difficult to recommend [that Father] have more time with [D.T.] because it is very likely [Father] will strongly alienate [D.T.] from [Mother]."

There was also conflicting evidence of family violence by Father. Benson's testimony and report reflected that D.T. and Mother's son had witnessed acts of violence by Father against Mother, and Father had hit and kicked Mother's son. Mother testified Father pushed and pulled

–12–

her during the marriage, and Father admitted he had yelled and cursed at Mother and called her a "sisterfucker." Yasmin and Day testified they had seen bruises on Mother on multiple occasions, and Yasmin testified she saw Father slap D.T.'s face. Dr. Milburn, however, testified that in the course of her second evaluation, "the information that [she] looked at called [into] question whether or not [the accusation of sexual abuse] was an accurate allegation," and Dr. Collins was also "inconclusive regarding whether family violence had occurred."

During the three-and-one-half year pendency of the parties' divorce, the trial court[6] and court-appointed psychologists, counselors and facilitators had ample opportunity to observe and evaluate the parties' personalities, weigh the credibility of witnesses, assess D.T.'s physical, mental and emotional well-being, and make an informed decision as to the conservatorship arrangement that would serve D.T.'s best interest. The trial court made clear to the parties that its decision regarding the parties' respective conservatorship rights and duties were based on its concern for effectuating D.T.'s best interest.

As the sole judge of the credibility of the witnesses, it was the role of the trial court to resolve conflicting witness testimony. Considering the entirety of the record in this case, we cannot conclude the trial court abused its discretion in resolving the conflicting evidence in Mother's favor and determining that it was in D.T.'s best interest to grant Mother the exclusive right to designate D.T.'s primary residence. We resolve Father's first issue against him.

## CHILD SUPPORT

In his second issue, Father complains the trial court abused its discretion in ordering him to pay $1,450 per month in child support, because there is no evidence that the amount was calculated based on his net resources. We review a trial court's determination of child support

---

[6] Based on a recusal, on September 23, 2015, this case was transferred from the 254th Judicial District Court of Dallas to the 330th Judicial District Court of Dallas.

under the abuse of discretion standard set forth, *supra*. *Worford*, 801 S.W.2d at 109; *In re B.Q.T.*, No. 05-14-00480-CV, 2016 WL 861633, at *1 (Tex. App.—Dallas Mar. 7, 2016, no pet.) (mem. op.). Unless the complaining party demonstrates a clear abuse of discretion, we will not disturb a trial court's order on child support. *Worford*, 801 S.W.2d at 109.

The Texas Family Code provides that when, as here, the parties have one child and the obligor's monthly net resources are not greater than $7,500 a month, the trial court shall presumptively base its child support award on twenty percent of the obligor's net resources. TEX. FAM. CODE ANN. § 154.125(b). Under the family code, net resources include wages, self-employment income, net rental income, and "all other income actually being received, including severance pay, retirement benefits, pensions, trust income, annuities, capital gains, social security benefits . . . ." *Id.* § 154.062(b). In calculating net resources, the trial court must deduct any social security taxes, federal and state income taxes, and expenses for, among other things, cash medical support for the child ordered by the court. *Id.* § 154.062(d).

The statutory guidelines are "presumed to be reasonable," and an order of child support conforming to the guidelines is presumed to be in the best interest of the child. *Id.* § 154.122. However, a trial court may determine that application of the guidelines would be unjust or inappropriate under the circumstances, and order child support in an amount other than that established by the guidelines if "the evidence rebuts the presumption that application of the guidelines is in the best interest of the child and justifies a variance from the guidelines." *Id.* §§ 54.122, 154.123. In determining whether application of the guidelines would be unjust or inappropriate under the circumstances of a particular case, the family code further provides that the trial court "shall consider," among other things, the age and needs of the child, the ability of the parents to contribute to the support of the child, the financial resources available for the support of the child, and "any other reason consistent with the best interest of the child, taking into

consideration the circumstances of the parents." *Id.* § 154.123(a), (b). If a trial court deviates from the statutory guidelines, the trial court must make findings to support its variance from application of the guidelines. *Id.* §154.130. Specifically, the trial court must set forth the monthly net resources of the obligor, the monthly net resources of the obligee,[7] the percentage applied to the obligor's net resources for child support, and the specific reasons the trial court deviated from the statutory guidelines. *Id.* §154.130(b).

Here, the evidence in the record regarding Father's net resources is conflicting and imprecise.[8] At the August 2013 temporary orders hearing, Father testified both that his income was $74,500 and that he and Mother made "the same amount of money . . . between [$]100- and 150,000." At trial, Mother testified that, based on "the last income tax statement," Father "make[s] . . . $91,000 a year."

Mother's Requested Relief, which was signed by her counsel and introduced into evidence at trial, asked the trial court to order Father to pay child support and cash medical support of $1,446.83 per month. According to Mother, this amount was "based on the last year [sic] pay stub" from "several months" past that Father provided.[9] Mother's Requested Relief included the method she used to calculate the requested monthly child support as follows:

> $8,576.38 gross monthly wages
> $6,340.57 net resources
> x 20%  **$1,268.00 Monthly Child Support**
>
> [Mother] and her children $4,351 - $2,205 ([Mother] only)
> $2,146 for two children, divided by half, $1,073, Divide by 12

---

[7] The findings specified by section 154.130(b)(2)—the net resources of the oblige—are only required if evidence of the monthly net resources of the obligee has been offered. *Id.* § 154.130(c).

[8] The family code provides, "[i]n the absence of evidence of a party's resources, as defined by Section 154.062(b), the court shall presume that the party has income equal to the federal minimum wage for a 40-hour week to which the support guidelines may be applied." TEX. FAM. CODE ANN. § 154.068(a). In the present case, the trial court was not faced with an "absence" of evidence of Father's net resources, and section 154.068 does not apply.

[9] We did not locate an income tax return or a pay stub for Father in the record.

**$89.42 and $14.23 Medical and Dental for [D.T.]**

However, gross monthly wages in the amount of $8,576.38 equates to gross annual wages of $102,916.56, not $91,000. Moreover, even assuming the amount of Father's monthly net resources was $6,340.57, as stated in Mother's Requested Relief, monthly child support due under section 154.125 would be $1,268.11,[10] the amount reflected in Mother's Requested Relief.

Although Mother requested the trial court order Father to pay $1,446.83 in monthly child and medical support, the trial court ordered Father to pay $1,450 in monthly child support and ordered Mother to provide and pay for D.T.'s medical insurance. Accordingly, the amount of child support that Father was ordered to pay does not appear to be based either on the evidence or on Mother's request. Moreover, assuming the trial court deviated from the guidelines governing child support awards set forth in section 154.125 of the family code, it did not make the statutorily mandated findings under section 154.130 of the family code.

We conclude that, on this record, the trial court abused its discretion in ordering Father to pay monthly child support in the amount of $1,450. We reverse the trial court's order requiring Father to pay Mother monthly child support in the amount of $1,450, and remand that portion of the trial court's final divorce decree for further proceedings consistent with this opinion. In all other respects, the trial court's judgment is affirmed.

/Ken Molberg/
KEN MOLBERG
JUSTICE

171224F.P05

---

[10] Under section 154.125, Father must pay child support in the amount of twenty percent of his net resources. TEX. FAM. CODE ANN. § 154.125.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF D.T., A CHILD,

No. 05-17-01224-CV

On Appeal from the 330th Judicial District Court, Dallas County, Texas, Trial Court Cause No. DF-13-12945. Opinion delivered by Justice Molberg. Justices Whitehill and Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part.

We **REVERSE** that portion of the trial court's judgment ordering appellant Aman Tara to pay monthly child support to appellee Vandna Vaid in the amount of $1,450. We **REMAND** the issue of child support to the trial court for further proceedings consistent with this opinion.

In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that the parties bear their own costs of appeal.

Judgment entered this 11th day of March 2019.