

In The

# Court of Appeals
## Seventh District of Texas at Amarillo

No. 07-24-00138-CV

IN THE INTEREST OF L.K.M. AND C.C.M., CHILDREN

On Appeal from the 126th District Court
Travis County, Texas[1]
Trial Court No. D-1-FM-20-002499, Honorable Maria Cantu Hexsel, Presiding

June 12, 2025

## MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Amy Axtell (Mother) appeals from a final order modifying conservatorship and possession of her two children with Jason Paul Miller (Father). Through ten issues, Mother challenges the trial court's decisions granting Father primary custody and exclusive decision-making rights while ordering Mother to undergo psychological evaluations and limiting her to a step-up possession schedule. We affirm.

---

[1] This appeal was originally filed in the Third Court of Appeals and was transferred to this Court by a docket-equalization order of the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001. In the event of any conflict, we apply the transferor court's case law. TEX. R. APP. P. 41.3.

## Background

The Relationship and Divorce

Mother and Father had a relationship spanning over twenty years. Throughout this period, Mother falsely represented to Father, her parents, and others that she was a cardiothoracic surgeon when she, in fact, did not hold a license to practice medicine, medical diploma, or an undergraduate degree.

The parties had two children: L.K.M. was eight and C.C.M. was five at the time of final hearing. Father filed for divorce in May 2020. When Father discovered two months later that Mother was not a surgeon, she claimed she had obtained an undergraduate degree and had attended medical school. In August 2020, the parties signed a mediated settlement agreement. Father subsequently learned that Mother lacked an undergraduate degree.

The trial court rendered their divorce in January 2021, signing a decree memorializing the judgment in August 2021. The decree appointed the parties joint managing conservators with Mother having the exclusive right to designate the children's primary residence. Father received a graduated possession schedule. All remaining rights were shared jointly, with each parent holding independent decisional rights concerning "day to day" or "routine" medical issues.

The Children's Deteriorating Behavior

By fall 2020, Father noticed the children becoming increasingly difficult during exchanges when Mother was present. They refused to get out of the car or had to be

2

physically removed. Despite Father's suggestions for counseling, the parties could not reach an agreement. The tension escalated until May 2021, when L.K.M. struck Father in the throat during an exchange.

In mid-2021, Mother and Father began co-parenting therapy with Jennifer Knight, and the children entered counseling with Fiona Ryon. Ryon became concerned about negative comments L.K.M. made about Father that seemed inconsistent with her behavior toward him. Father reported to Mother, Knight, and Ryon that the children made negative comments directly to him. Despite professional intervention, the parties continued to struggle with communication and co-parenting.

<u>The Custody Modification Battle Begins</u>

On March 1, 2022, Father filed for modification, seeking exclusive rights to designate the children's primary residence and make medical, psychological, and educational decisions. According to the evidence, Father's modification petition was driven by the breakdown of his relationship with his daughters, growing concerns about Mother's pattern of dishonesty, and their co-parenting difficulties.

The final hearing included evidence from multiple professionals who had conducted evaluations and assessments of the parties and children.

*1. Dr. Baker*

In June 2022, the parties agreed to a child custody evaluation by Dr. Kelley A. Baker, who also served as the children's guardian ad litem. Dr. Baker conducted a

3

comprehensive evaluation that included reviewing over one hundred documents, interviewing at least twenty collateral witnesses, and making home visits to both parents.

As part of her investigation, Dr. Baker asked each party to identify their concerns about the other parent's ability to parent and their relationships with the children. Father's concerns included that Mother engaged in behaviors that negatively impacted his relationship with the children, misrepresented information about the children's health, and continued her pattern of dishonesty in ways that could endanger the children. Mother's concerns about Father included allegations that he did not properly feed or bathe the children, did not emotionally engage with them, and exercised poor judgment when they were sick.

Dr. Baker found no support for any of Mother's concerns about Father, opining that Mother's alleged concerns were not grounded in reality. Dr. Baker testified this was concerning because Mother's distorted thinking puts the children at risk—she may perceive danger when none exists, believe she needs to protect the children when unnecessary, and make irrational decisions limiting their contact with Father.

In contrast, Dr. Baker found evidence supporting Father's concerns that Mother had engaged in behaviors that negatively affected his relationship with the children: speaking negatively of Father to the children; withholding educational and medical information from Father; limiting or interfering with Father's time with the children; sharing inappropriate information about the marriage and legal matters with the children; and causing the children to choose or feel guilty for loving Father. These decisions have the

4

potential to place the children in dangerous situations when Mother fails to convey medical information correctly or refuses to follow doctors' orders.

Dr. Baker also documented Mother's continued false representations during the lawsuit. Although Mother told Dr. Baker that her parents actually knew she had not, in fact, graduated from medical school, Dr. Baker discovered through speaking with Mother's parents that they still believed she was a doctor. Dr. Baker testified this was significant because it evidenced Mother's continued pattern of making false statements after the divorce was rendered.

Mother also lied to Dr. Baker, claiming she had an undergraduate degree from the University of Utah. Dr. Baker concluded this pattern affected Mother's decision-making and judgment, with the potential of placing the children in unsafe situations.

Dr. Baker observed patterns in Mother's interactions with professionals. Mother attempted to cease family therapy because she had not been copied on a scheduling email. Following depositions, Mother attempted to have the children's therapist (Ryon) removed from the case. When that therapist recommended one of the children begin weekly therapy sessions due to serious transitional problems, Mother disagreed.

Dr. Baker also investigated the parties' communication patterns as part of her evaluation. When Baker asked Mother how she wanted to communicate with Father, Mother responded that she does not like communicating with him because his communications are too frequent, high conflict, accusatory, benefit no one, and are unconstructive.

Additional testimony was presented regarding communication patterns. Father testified that Mother sometimes waited weeks or a month to respond to messages on Our Family Wizard, an online platform designed for divorced parents to coordinate scheduling and communicate about their children. Mother testified that she didn't like Our Family Wizard and was apprehensive toward it because she felt that Father had unilaterally chosen to use it.

In a September 2023 report that was admitted into evidence, Dr. Baker made eleven specific recommendations to the court, including that the parties remain joint managing conservators but with Father awarded exclusive decision-making rights in medical, educational, and psychological decisions and the exclusive right to establish the primary residence of the children. She recommended Mother be awarded a standard possession order with Wednesday evening possession during the school term, with consideration for expanding Mother's possession schedule after one year if she met certain conditions, including meeting with a neuropsychologist and psychiatrist and refraining from making false statements about the children's medical conditions or negatively impacting their perception of Father.

Dr. Baker also recommended that Father identify specific medical providers and that Mother be required to take the children only to those providers; that Mother immediately notify Father if the children require medical attention while in her care; that Mother not be allowed to take children from school for medical appointments without Father's consent; and that Father manage all extracurricular activities in consultation with Mother.

6

Dr. Baker supported her recommendations with testimony that she "believe[d] that the children's safety and their health are at risk until [Mother] gets a better understanding of what's going on for her and some treatment." Baker expressed concern there had been a lot of negative influence on the children in regards to Father, putting their relationship with Father at risk.

Dr. Baker opined that "flipping custody" (from Mother to Father) was the best solution for the children as it would give Mother time to "get really serious about figuring out why she does the things she does so that she can change her behavior." She also testified:

> . . . I really worry about a parent who will make decisions based off of false reality. I think that's when we put kids the most at risk because they're not assessing reality correctly and they truly believe that they're -- protecting their kids[.]

*2. Dr. Sherry*

Dr. Baker recommended that both parties undergo psychological evaluations. By agreed order, Dr. Alissa Sherry was designated as the lead examiner to conduct psychological testing of the parties.

Dr. Sherry found that Mother had severe issues with perception and thinking that interfered with her functioning and presented risks to the children's safety and health. According to Dr. Sherry, Mother had serious deficits in reality testing, and her behaviors fell into "quasi psychotic thinking." Although not caused by a psychotic disorder, these deficits were severe enough to impair Mother's functioning, preventing her from perceiving reality accurately or making good decisions.

Dr. Sherry found that Mother's behavior fit the criteria for pathological lying: "a persistent and pervasive pattern of excessive lying behavior occurring for longer than 6 months." Although pathological lying is not a diagnosis in the Diagnostic and Statistical Manual of Mental Disorders, Dr. Sherry testified that this did not invalidate her findings, explaining that "there are rules about whether or not something is in the DSM. And some of those rules don't have anything to do with whether or not they're valid concepts in psychology."

Dr. Sherry concluded that Mother's lying serves to receive attention and affection, potentially reinforcing the behavior. Her report found that because of Mother's fear of losing the unconditional love of her children, Mother orchestrates situations where the children cling to her and reinforce feelings of unconditional love—even at the cost of their relationship with Father.

Dr. Sherry's report opined that Mother likely lacks the insight to understand how her behavior affects the children, making it more likely she will engage in conduct that jeopardizes their emotional or physical health and safety to create situations where the children need her. Dr. Sherry noted that Mother's emotional needs were so intense that they led her to create an entirely fictional existence for over a decade. This, in turn, places her at risk of being manipulated by anyone who suggests they can provide her with the attention she craves, even if it endangers her and her children's health and safety.

Dr. Sherry recommended that Mother continue weekly therapy focused on pathological lying, trauma, and cognitive distortions; meet with a board-certified

neuropsychologist for evaluation; and consult with a psychiatrist for medication regarding her cognitive distortions.

As for Father, Dr. Sherry noted that his assessment findings were normative. She was presented no evidence that Father had ever behaved in ways considered to be outside the norm of a loving, caring parent.

*3. Dr. Thorne*

Mother attempted to undermine these findings through rebuttal testimony of Dr. Stephen Thorne, a licensed psychologist. Dr. Thorne's testimony was based solely on his review of Dr. Sherry's and Dr. Baker's reports. Dr. Thorne focused his criticism on Dr. Sherry's use of the phrase "pathological lying," which he noted is not an officially recognized diagnosis in the DSM. He suggested this term could be misleading or inaccurate. When asked whether Dr. Sherry's evaluation supported characterizing Mother as a pathological liar, Dr. Thorne responded that the testing results alone would not lead him to that conclusion.

Dr. Thorne testified that he would have described the findings differently in his report. Rather than using diagnostic language, he would have referenced the individual's chronic or pervasive history of deception and lying. Despite these methodological concerns, Dr. Thorne conceded that Dr. Sherry's characterization did not invalidate the information in her report. The trial court found that Dr. Thorne testified it was entirely possible and reasonable to conclude that he might have reached similar conclusions and/or recommendations as Dr. Sherry had he possessed the same information.

*4. Dr. Krejci*

Mother also called her individual therapist, Pamela Krejci, who had conducted fifty-two sessions with Mother since June 2022. Krejci testified she had no concerns about Mother's parenting abilities. However, Krejci's knowledge was limited to her direct interactions with Mother and she had not spoken with the children, Father, or the other professionals involved in the case.

Krejci testified that she had not seen any evidence in her work with Mother that Mother was a pathological liar. When asked whether she had any concerns about Mother remaining the primary parent of the children, Ms. Krejci responded she had none.

The Trial Court's Decision

Following a four-day hearing in October 2023, the trial court made extensive findings. It found Dr. Baker and Dr. Sherry credible witnesses who provided reliable and persuasive evidence. The court additionally found that Father's testimony was credible, whereas, Mother's testimony was not.

The court awarded Father exclusive rights to designate the children's primary residence in Travis and Williamson Counties, make medical and educational decisions following written consultation with Mother, and receive child support. Mother was ordered to undergo neuropsychological and psychiatric evaluations and was awarded a two-phase step-up possession schedule.[2]

---

[2] The step-up possession schedule awarded Mother standard possession with Wednesday weekday possession during phase one, progressing to expanded standard possession in phase two if Mother completed therapy, neuropsychological evaluation, and psychiatric treatment requirements by January 1, 2025.

The trial court found that Mother's pattern of lying since the mediated settlement agreement impacted her credibility and the consideration of the children's best interests.

**Analysis**

Mother presents ten issues on appeal, each challenging the trial court's exercise of discretion in modifying the terms of possession, conservatorship, and access.

The standards of review for decisions involving suits affecting parent-child relationships are well-established and need not be reiterated in detail. Trial courts possess wide discretion in determining custody, control, possession, support, and visitation matters involving children. *Kramer v. Kastleman*, No. 03-13-00133-CV, 2017 Tex. App. LEXIS 10326, at *4–5 (Tex. App.—Austin Nov. 3, 2017, pet. denied) (mem. op.) We will reverse only if the trial court acted unreasonably, arbitrarily, or without guiding principles. *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.). Whether the evidence is legally or factually sufficient is evaluated as part of the abuse of discretion analysis rather than as independent grounds for reversal. *Id.*

We give great deference to the trial court's assessment of witness credibility because the trial judge directly observes testimony and can perceive nuances not apparent from the written record. *Id.* at 823–24.

Modification of conservatorship requires proof that circumstances have materially and substantially changed since the prior order, and modification would be in the child's best interest. *See* TEX. FAM. CODE ANN. § 156.101.

**Issues One through Five**

In her first five issues, Mother argues the trial court abused its discretion by granting Father exclusive rights to: (1) designate the children's primary residence; (2) consent to medical, dental, and surgical treatment; (3) consent to psychiatric and psychological treatment; (4) make educational decisions; and (5) receive child support. Mother concedes that she and Father have had "numerous miscommunications and disagreements about medical issues," but believes she was not treated equally at trial—that Dr. Baker and Dr. Sherry emphasized conduct that put her in a poor light while de-emphasizing similar conduct by Father.

The evidence shows that Mother's deceptions extended far beyond her twenty-year lie about being a cardiothoracic surgeon. During the evaluation process, she continued lying to Dr. Baker about having an undergraduate degree and falsely claimed her parents knew the truth about her medical credentials when evidence suggests they still believed she was a doctor. According to testimony, she made false statements about the children's medical conditions and withheld critical medical information from Father.

Dr. Sherry found that Mother had "severe issues with perception and thinking" that interfered with her functioning and presented risks to the children's safety and health. These deficits in reality testing were severe enough to impair Mother's decision-making and prevent her from perceiving situations accurately. Dr. Sherry characterized Mother's behavior as falling into "quasi psychotic thinking"—not caused by a psychotic disorder, but serious enough to affect her judgment.

Dr. Baker documented how Mother's distorted thinking affected the children directly. Mother spoke negatively about Father to the children, withheld educational and medical information, limited Father's time with them, and shared inappropriate details about the marriage and legal proceedings. Dr. Baker warned that Mother's inability to assess reality correctly put the children "most at risk."

Mother relies heavily on Dr. Thorne's criticism of the "pathological lying" terminology and therapist Krejci's opinion that she had no parenting concerns. But Dr. Thorne reviewed only Dr. Sherry's and Dr. Baker's reports without access to the extensive collateral data they gathered. He acknowledged that he might have reached similar conclusions if provided the same information. Krejci's knowledge was limited to her therapy sessions with Mother, without speaking to Father, the children, or the other professionals involved.

The trial court found Dr. Baker and Dr. Sherry credible while finding Mother's testimony was not credible. The court specifically found that Dr. Thorne's testimony "did not provide sufficient evidence to discount the accuracy of [Dr. Sherry's] psychological evaluations and opinions." On this record, we find that a reasonable factfinder could have credited the testimony of Father, Dr. Baker, and Dr. Sherry over the limited rebuttal evidence. "We defer to the trial court's resolution of factual disputes and related credibility determinations; we may not substitute our judgment for the trial court's judgment in those matters." *Spence v. Davis,* No. 03-22-00179-CV, 2023 Tex. App. LEXIS 564, at *5 (Tex. App.—Austin Jan. 27, 2023, no pet.) (mem. op.).

13

The evidence supports the trial court's finding that Mother's distorted perception of reality creates concrete risks: she may withhold critical medical information, make healthcare decisions based on false premises, or continue to damage the children's relationship with their father. Mother has not shown that the trial court abused its discretion. Issues one through five are overruled.

**Issues Six and Seven**

In her sixth and seventh issues, Mother argues the trial court abused its discretion by ordering her to undergo a neuropsychological evaluation and meet with a psychiatrist for evaluation, treatment, and possibly medication. Both requirements are tied to Mother's opportunity to obtain an expanded possession schedule.

We find the trial court's orders directly served the children's best interests and are consistent with expert witness recommendations. Dr. Sherry agreed that Mother had "severe issues with perception and thinking" that interfered with her functioning and presented risks to the children's safety and health. She emphasized that if Mother wished to modify her behavior, it was crucial that she undergo evaluation by a board-certified neuropsychologist to obtain comprehensive feedback and engage with a psychiatrist to better understand her actions. Dr. Baker echoed both recommendations.

The process serves the children's interests by providing Mother a clear pathway to increased possession while ensuring their safety during Mother's recommended treatment process. Mother does not show that the trial court's orders constituted an abuse of discretion. Issues six and seven are overruled.

14

**Issues Eight through Ten**

In her final three issues, Mother argues the trial court abused its discretion by ordering a two-phase, step-up possession schedule that requires her to meet certain conditions before obtaining an expanded standard possession order.

Trial courts have discretion to establish conservatorship terms, including the frequency and duration of visits and any necessary limitations. *In re L.M.M.*, No. 03-04-00452-CV, 2005 Tex. App. LEXIS 7191, at *28–29 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.); TEX. FAM. CODE ANN. § 153.193. Such restrictions "may not exceed those that are required to protect the best interest of the child." TEX. FAM. CODE ANN § 153.193. When ordering terms other than the standard possession order, the trial court may consider the child's age, developmental status, circumstances, and needs; the circumstances of both parents; and any other relevant factor. *Id.*

Mother again relies on the testimony of Krejci and Dr. Thorne to argue for an abuse of discretion. We have noted above that the trial court was within its discretion to discount the testimony of these professionals.

Mother characterizes the step-up order as a "severe limitation" requiring "rigorous preconditions." But the trial court's restrictions followed the express recommendations of Dr. Baker and Dr. Sherry. Dr. Sherry concluded that Mother likely lacks insight into how her severe perception and thinking issues affect the children, making it more likely she will engage in behavior that jeopardizes their emotional and physical health to create situations where they need her. Both experts recommended that Mother engage with a neuropsychologist and psychiatrist before expanded possession could be considered.

15

Dr. Baker specifically recommended a standard possession order with Wednesday evening visits, with consideration for expansion after one year if Mother met certain conditions: meeting with both a neuropsychologist and psychiatrist, refraining from lying about medical conditions, and refraining from negatively impacting the children's perception of Father. Dr. Baker testified that "flipping custody" would give Mother time to "get really serious about figuring out why she does the things she does so that she can change her behavior."

In light of the evidence presented, the trial court did not abuse its discretion in modifying the decree's possession requirements.

Mother's eighth, ninth, and tenth issues are overruled.

**Conclusion**

Having overruled each of Mother's issues, we affirm the final order of the trial court.


Lawrence M. Doss
Justice